## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## LUFKIN DIVISION

JANE DOE (R.B.), AN INDIVIDUAL
*Plaintiff*

v.

CHOICE HOTELS INTERNATIONAL SERVICES CORP., CHOICE HOTELS INTERNATIONAL, INC., AND S & S HOTELS, INC.

*Defendants*

CIVIL ACTION NO:

## ORIGINAL COMPLAINT

COMES NOW Plaintiff Jane Doe (R.B.), by and through the undersigned counsel, and respectfully submits her original complaint for damages and makes the following averments.

## SUMMARY

1. R.B. is a survivor of sex trafficking. While she was a minor, her trafficker repeatedly and regularly trafficked her at several of his preferred hotels, one of which was the Comfort Inn located at 2450 Old National Parkway, College Park, GA ("College Park Comfort Inn"). R.B. was also trafficked at the Motel 6 located at 3860 Flat Shoals Rd, Union City, GA 30291 ("Union City Motel 6"), which is the subject of a related lawsuit in this District at Case No. 1:23-cv-00286.

2. On information and belief, the College Park Comfort Inn was jointly operated by Choice Hotels International Services Corp. and Choice Hotels International, Inc. (collectively "Choice") and S & S Hotels, Inc. ( "Choice Franchisee"). Choice Franchisee provided the on-site, day-to-day operations at the College Park Comfort Inn, while Choice directly participated in and

exercised control over core aspects of hotel operations, including room-rental and policies and practices central to identifying and responding to sex trafficking. In operating the College Park Comfort Inn, Choice Franchisee also acted as the agent of Choice due to the control Choice exercised over relevant aspects of hotel operations.

3. As detailed below, both Choice and Choice Franchisee derived benefit from use of the College Park Comfort Inn for sex trafficking, including the trafficking of R.B. Despite obvious and recurring indicators of trafficking, Choice and Choice Franchisee continued to rent rooms to traffickers and operated the College Park Comfort Inn in ways that enabled trafficking to flourish, creating a haven where traffickers could work undisturbed by hotel staff and with minimal risk of detection or traceability.

4. R.B. thus brings this civil action under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1581 *et seq.*, and 18 U.S.C. § 2255 to recover for the harms and losses she suffered because of the sex trafficking she endured while a minor at the College Park Comfort Inn—trafficking that Choice and Choice Franchisee facilitated and benefited from.

## PARTIES

5. R.B. is a natural person who is currently a resident and citizen of Florida. She was a minor until July 2013.

6. R.B. is a victim of sex trafficking under 18 U.S.C. §1591(a) and 18 U.S.C. § 2255 because she was harbored, transported, or provided for the purpose of causing her, while she was a minor and through force, fraud, or coercion, to engage in commercial sex.

7. R.B. will be filing a motion to proceed under a pseudonym shortly after filing this lawsuit. Given the nature of the allegations in this lawsuit, there is a collective, recognized, and compelling interest in not publicly revealing the identity of R.B.

8. Defendant Choice Hotels International Services Corp. is a Delaware corporation with its principal place of business in Rockville, MD.

9. Choice Hotels International, Inc. is a Delaware corporation. with its principal place of business in Rockville, MD.

10. Choice Hotels International Services Corp. and Choice Hotels International, Inc., are herein referred to as the "Choice Brand Defendants" or collectively as "Choice"

11. On information and belief, Choice participated in the operation, oversight, and control of the College Park Comfort Inn through the Choice franchising system.

12. Defendant S & S Hotels, Inc., is a Georgia corporation with its principal place of business in Georgia.

13. On information and belief, S & S Hotels, Inc., owned and participated in the operation and management of the College Park Comfort Inn through the Choice franchising system. S & S Hotels, Inc. will be referred to herein as "Choice Franchisee."

## JURISDICTION AND VENUE

14. This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA and 18 U.S.C. § 2255.

15. The Court has personal jurisdiction over all Defendants because, for claims under 18 U.S.C. § 2255, Congress authorized nationwide service of process and nationwide jurisdiction.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because, pursuant to 28 U.S.C. §§ 1391(c)(2), all Defendants are residents of the Eastern District of Texas.

**FACTS**

**I.     R.B. was a Victim of Unlawful Sex Trafficking at a Hotel Owned, Operated, Managed, and Controlled by Defendants.**

17.     R.B. is a victim of sex trafficking. She met her trafficker, an older man who she knew only by his street name, in 2011 when she was a minor, in foster care, and had run away from a group home. This man raped R.B. and told her that she was going to have to engage in commercial sex for his financial benefit. He then trafficked her until late 2013.  On occasions, R.B. would be returned back to foster care, but these periods never lasted long before she was back under the control of her trafficker.

18.     R.B.'s trafficker knew she was in foster care and knew she was a minor. And based on her appearance and general mannerisms, it was clear Jane Doe (R.B.) was under the age of 18. Jane Doe (R.B.) reached the age of 18 in July 2013.

19.     R.B. was required to give this trafficker all money generated from commercial sex. He never allowed R.B. direct access to money but would sometimes buy her things to increase her financial dependence on him.

20.     R.B.'s primary trafficker was a member of a gang.  He was verbally abusive to R.B. and would throw things at her.  When Jane Doe (R.B.) told this man that she did not want to engage in commercial sex, he berated her and became aggressive. He threatened that she would have to make  him  a certain amount of money or he would beat her. He would also threaten her family. He branded her wrist and forced her to get a tattoo of a symbol associated with his gang.

21.     On occasions when R.B. would attempt to leave, R.B.'s trafficker would have a group of his associates "jump," R.B. They beat her and took everything away from her, including her identification.

22.     This trafficker also used emotional manipulation and fraudulent promises to control R.B. He would repeatedly promise to help her avoid the foster system, to provide for her financially, and to treat her better. But these promises repeatedly proved false and were only intended to increase his control over R.B.

23.     While she was being trafficked, R.B. was never left alone; either her trafficker, one of his associates, or another girl being trafficked was always in the room with her.

24.     While she was being trafficked, R.B. did not have a permanent residence. Her trafficker consistently moved her back and forth between hotels.  R.B.'s trafficker moved her between a group of his preferred hotels in Fulton County, Georgia.

25.     R.B.'s trafficker used a consistent *modus operandi* across these hotels, producing recurring and readily observable indicia of trafficking at each location.  These indica matched with the industry recognized "red flags" of trafficking

26.      One of his preferred hotels was the College Park Comfort Inn. Between approximately 2011 and late 2013, R.B. was repeatedly and regularly trafficked for sex at the College Park Comfort Inn. R.B. estimates that she was trafficked at the College Park Comfort Inn 30 or more days.

27.     Staff and management at the College Park Comfort Inn had a reasonable opportunity to observe R.B., who at all relevant times was a minor.

28.     R.B. remained under the continuous control of her trafficker through late 2013.

29.     At the end of 2013, an older woman  who R.B. had met in Atlanta offered to take R.B. to Florida with promises of a better life and to help R.B. get away from her abusive trafficker. However, once in Miami, this woman and another man took advantage of R.B.'s vulnerable

situation and continued to benefit from posting her online for commercial sex, which continued until R.B. became pregnant.

**II.    The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.**

30.    The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the Defendants knew or should have known regarding the trafficking at Choice hotels and specifically at the College Park Comfort Inn, including the trafficking of R.B.

31.    Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[1] For years, sex traffickers have been able to reap their profits with little risk when attempting to operate within hotels.[2] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[3] Hotels have been found to account for over 90% of the commercial exploitation of children.[4]

32.    Because of this link between hotels and sex trafficking, government bodies, law enforcement agencies, non-profits, and hotel trade associations—including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, EPCAT, and others—have devoted significant efforts

---

[1] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune (April 2019),https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[2] *See Human Trafficking in the Hotel Industry*, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; *see also* Eleanor Goldberg, *You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic*, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57741091e4b0f168323a1ed7.

[3] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report (Oct. 2015), https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.

[4] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).

to intervening and educating the hotel industry, including each of the Defendants, on best practices for identifying and responding to sex trafficking.[5]

33. This resulted in the development of "red flags" of sex trafficking. Law enforcement agencies and other organizations with subject-matter expertise identified specific indicators of the presence of sex trafficking at a hotel. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel. These recurring indicators are known as "red flags" of sex trafficking.

34. Recognized "red flags" of sex trafficking that are considered general indicators of trafficking that can be observed by staff throughout a hotel[6] include:

 a. individuals who appear to be with a significantly older "boyfriend" or in the company of much older males;

 b. a group of girls who appears to be traveling with an older female or male;

 c. a group with similar tattoos, which can indicate "branding" by a trafficker;

 d. individuals showing fear, anxiety, tension, submissiveness and/or nervousness;

 e. individuals who seem disoriented;

 f. individuals showing signs of physical abuse;

 g. individuals showing signs of restrain or confinement;

 h. individuals showing signs of malnourishment, poor hygiene, fatigue, or sleep deprivation;

 i. individuals with signs of untreated illness or injuries;

 j. individuals who appear to lack freedom of movement;

---

[5] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *Red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .
[6] *See id.*

k.  individuals who are being constantly monitored and/or escorted around the hotel;

l.  individuals who avoid eye contact;

m.  individuals who avoid interactions with others;

n.  individuals who are not in possessions of their own identification;

o.  individuals who have few or no personal possessions;

p.  individuals who dress provocatively;

q.  a high volume of men who are not registered guests entering and exiting a room; and

r.  individuals who wait in common areas while other men frequent the room.

35.  Recognized "red flags" of sex trafficking that can be detected by front-desk staff and hotel security[7] include:

a.  patrons appeared distressed at check-in;

b.  the same person reserving multiple rooms;

c.  rooms paid for with cash or prepaid cards;

d.  rooms are paid for one day at a time;

e.  requests for isolated rooms or rooms close to an exit;

f.  use of hotel computers for adult oriented or sexually explicit websites;

g.  patrons not forthcoming about identifying information when registering;

h.  individuals checking in but then leaving a room only infrequently, not at all, or at odd hours;

i.  individuals lack identification;

j.  car in the parking lot is parked so license plate is not visible;

k.  individual present who avoids eye contact, does not communicate, and is accompanied by someone else who appears to speak for them; and

l.  individual appears to be giving scripted responses.

36.  Recognized "red flags" of sex trafficking that can be detected by housekeeping, maintenance, and room service staff[8] include:

---

[7] *See id.*
[8] *See id.*

a. constant use of the "Do Not Disturb" sign;

b. requests for housekeeping services (towels, linens, etc.) but denying staff entry into the room;

c. refusal of cleaning services for multiple days;

d. excessive amounts of cash in a room;

e. presence of multiple computers, cell phones, pagers, or other technology;

f. the same person reserving multiple rooms;

g. individuals leaving the room infrequently, not at all, or at unusual hours;

h. individuals loitering in hallways or appearing to monitor a room;

i. excessive alcohol in a room;

j. illegal drugs in a room;

k. evidence of pornography;

l. excessive number of people staying in a room;

m. guests with few or no personal possessions in room;

n. provocative clothing and shoes;

o. constant flow of men into a room at all hours; and

p. excessive amounts of sex paraphernalia in rooms.

37. The organizations who developed these "red flags," then educated and trained the hotel industry about them. For example, the United States Department of Homeland Security's Blue Campaign initiative issued specific guidance to the United States hotel industry through a "Hospitality Toolkit" describing human trafficking warning signs that could be detected by various categories of hotel staff. [9]

38. Before R.B.'s trafficking period, each Defendant was educated and trained on these "red flags" of sex trafficking. The organizations that developed these "red flags" identified them as indicators specific to sex trafficking in a hotel environment. At all relevant times, each Defendant acknowledged and recognized these "red flags" specifically as signs of sex trafficking

---

[9] / Department of Homeland Security, Blue Campaign Toolkit, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.; www.doj.state.wi.us/sites/default/files/ocvs/human%20trafficking/Hospitality%20Toolkit%20-%20English%20-%20Wisconsin%20AG%20Office%281%29.pdf

and instructed and trained their staff to treat them as signs of sex trafficking when observed in its hotel(s).

39.     It is, and has at all relevant times, been well established that signs of commercial sex in a hotel environment are "red flags" for the presence of sex trafficking.

40.     There is a well-known link between commercial sex in a hotel environment and sex trafficking. The United States Department of Justice and other agencies and organizations have recognized that most individuals involved in commercial sex are subject to force, fraud, or coercion.[10] As a result, these women are victims of sex trafficking. Most federal sex trafficking prosecutions involve individual traffickers acting as "pimps" who are operating without direction from or connection to a larger criminal network.[11] It is well known that the "traffickers in hotel/motel based commercial sex situations are often individual controllers, more commonly known as 'pimps.'"[12]

41.     State, local, federal, and international governments and law enforcement agencies have long recognized the link between commercial sex and sex trafficking. For example:

- "The U.S. Government adopted a strong position against legalized prostitution in a December 2002 National Security Presidential Directive based on evidence that prostitution . . . . fuels trafficking in persons, a form of modern-day slavery."[13]

---

[10] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.

[11] Human Trafficking Institute, 2020 Federal Human Trafficking Report 28 (2021), https://traffickinginstitute.org/wp-content/uploads/2022/01/2020-Federal-Human-Trafficking-Report-Low-Res.pdf.

[12] National Human Trafficking Hotline, *Hotel-Motel Based*, https://humantraffickinghotline.org/en/sex-trafficking-venuesindustries/hotelmotel.

[13] United States Department of State, *The Link Between Prostitution and Sex Trafficking* https://2001-2009.state.gov/r/pa/ei/rls/38790

- In 2006 the United Nations Commission on Human Rights, Special Rapporteur or Trafficking in Persons recognized that "[f]or the most part, prostitution, as actually practiced in the world, usually does satisfy the elements of trafficking."[14]

- By 2008, a report of the Illinois Criminal Justice Information Authority concluded "young women in the sex trade who are controlled by a pimp should not be regarded as girls in prostitution, but as victims of violence who need assistance in safely exiting prostitution."[15]

- In 2010, the Anaheim Police Department (APD) recognized that a significant portion of those involved in prostitution who it came into contact with were likely trafficking victims and adopted a new approach that focused on rescuing women from their pimps and redirecting their lives.[16]

- In 2013, the New York State Court System launched the Human Trafficking Intervention Initiative recognizing that many individuals who end up in criminal courts are on prostitution charges "are recruited into the commercial sex industry by force, fraud, and/or coercion."[17]

42. When governmental bodies, law enforcement agencies, non-profits, and hospitality-industry organizations developed the "red flags" of sex trafficking in a hotel, they recognized that signs of commercial sex are and should be treated as signs of sex trafficking. Based on the known link between commercial sex and trafficking and the patterns of sex trafficking in hotels, these entities recognized that certain signs associated with commercial sex are important indicators for the detection of sex trafficking in a hotel.

43. Defendants, as members of the hotel industry, were educated and trained on the link between commercial sex in a hotel and sex trafficking. Accordingly, as of the time of R.B.'s

---

[14] U.N. Escor, Comm'n on Human Rights, *13 Integration of the Human Rights of Women and a Gender Perspective, Report of the Special Rapporteur on the Human Rights Aspects of the Victims of Trafficking in Persons, Especially Women and Children, ¶ 42 U.N. Doc. E/CN.4/2006/62 (Feb. 20, 2006) (Sigma Huda)

[15] https://humantraffickinghotline.org/sites/default/files/Domstic%20Sex%20Trafficking%20Chicago%20-%20ICJIA.pdf

[16] Steve Marcin, *Prostitution and Human Trafficking: A Paradigm Shift*, Law Enforcement Bulletin, https://leb.fbi.gov/articles/featured-articles/prostitution-and-human-trafficking-a-paradigm-shift#:~:text=After%20close%20analysis%20of%20prostitutes,tactic%20in%20addressing%20the%20problem.

[17] Center for State Court Innovation, *State Court Snapshot: New York State's Human Trafficking Intervention* Courts, https://cjinvolvedwomen.org/wp-content/uploads/2016/12/HTIC-1pager.pdf

trafficking, each Defendant was on notice and recognized that signs of commercial sex in a hotel are and should be treated as signs of sex trafficking.

44.     Each Defendant knew that the link between commercial sex in a hotel environment and sex trafficking was sufficiently strong that ordinary prudence required treating signs of commercial sex activity as signs of sex trafficking. Under the circumstances, ordinary prudence further required each Defendant to avoid benefiting from rental of its rooms for commercial sex because doing so was associated with a strong probability that Defendants were thereby benefiting from the harboring of sex trafficking victims.

45.     Texas began reporting on the problem of human trafficking in the state by 2008. It was known that traffickers were targeting juvenile runaways.[18] And the role of gangs in facilitating sex trafficking was well known.[19]

46.     The most effective weapon against sexual exploitation and human trafficking is education and training.[20] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[21]

47.     This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing

---

[18] Statement of the Director of the Texas Department of Public Safety, https://democrats-homeland.house.gov/imo/media/doc/20140320104640-70465.pdf
[19] *Id.*
[20] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).
[21] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

to report it – than those who have not been trained.[22] In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

48.     There were also well-established practices for hotels to avoid the facilitation of sex trafficking. For example, End Child Prostitution and Trafficking ("ECPAT-USA") has identified hotel-specific best practices for preventing sex trafficking, such as (1) not permitting cash payments; (2) requiring vehicle information and photo id at check-in; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly and blocking websites frequently used to advertise commercial sex on hotel Wi-Fi; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number; and (8) developing a protocol for response to indicia of trafficking activity.

49.     Because of the prevalence of human trafficking in hotels and the established body of knowledge about how hotels can detect and respond to signs of sex trafficking, it has long been apparent that the decision of a hotel or hotel chain to continue generating revenue from traffickers without taking necessary steps to identify and deter trafficking is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

50.     Defendants have made the choice to ignore their knowledge of sex trafficking in their hotels and instead to inadequately train, respond and enforce their own developed and adopted sex trafficking policies. Thus, they have chosen to continue to benefit from sex trafficking of victims like R.B.

---

[22] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

**III. Sex Trafficking Has Long Been a Known Problem at Choice Hotels.**

51. Choice's actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Choice has known, since well before R.B.'s trafficking, that sex trafficking was ongoing and widespread at Choice properties, including Comfort Inn hotels.

52. Choice adopted a brand-wide approach to trafficking-related issues at all Choice-branded properties, including Comfort Inn properties.

53. On information and belief, Choice monitored criminal activity occurring at its branded hotels and was aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels. Information that has become public through news stories establishes the entrenched and pervasive nature of the Choice's role in providing a venue where sex trafficking has continued unabated for years. Examples of news stories confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at Choice hotels and Choice's notice of the same:

- In December 2007, police arrested four individuals at a Pittsburgh-area Comfort Inn during a sting operation in an investigation involving a prostitution ring.[23]

- In July 2008, the Boston Herald reported that the Comfort Inn in Brighton had been the site of 16 prostitution busts since 2005, prompting neighborhood concern.[24]

- In December 2009, federal prosecutors charged two individuals after an investigation found that a room at a Comfort Inn on Post Road in Warwick, Rhode Island was used to facilitate interstate prostitution activity in violation of the Mann Act.[25]

- In August 2010, Metro detectives arrested a Georgia man after responding to an online escort advertisement and meeting two 17-year-old girls at the Comfort Inn on Elm Hill Pike in connection with a sex-trafficking investigation.[26]

---

[23] *Former Aliquippa Football Star Charged in Prostitution Ring*, PITT. TRIB.-REV., Dec. 21, 2007 (Associated Press) available at https://plus.lexis.com/api/permalink/b77e11cf-deff-4d12-b094-fc80e8efe02e/?context=1530671
[24] *Neighbors Shocked by Nearby Blight*, BOS. HERALD, July 7, 2008, at 5, available at https://plus.lexis.com/api/permalink/e89fd7d3-d39c-46d1-956a-af164e4fb587/?context=1530671
[25] *Complaint Charges Alleged Violation of the Mann Act*, TARGETED NEWS SERV., Dec. 30, 2009.
[26] Metro Police Nab Georgia Man in Sex Trafficking Case, CITY PAPER (Nashville, Tenn.), Aug. 31, 2010, available at: https://plus.lexis.com/api/permalink/e85b2c36-5973-459c-8215-da8bbad9fac8/?context=1530671

- • In October 2011, Massachusetts prosecutors charged a Boston man in connection with forcing 15 and 16 year old girls into commercial sex, including at a Comfort Inn.[27]

- In August 2013, a man was charged with human trafficking after he held a 15-year-old girl against her will at a Choice Property in Alabama where she was beaten, forced to do drugs, and sold for sex.[28] The man was sentenced to fifty years for human trafficking.[29] A civil lawsuit was later filed against this Choice Property.[30]

- In March 2013, St. Joseph County prosecutors charged a South Bend man with promoting prostitution of three women, including a teenager, at a Comfort Inn.[31]

- In September 2011, Albuquerque police arrested two Arizona men at a Comfort Inn near Central Avenue and Tramway Boulevard during a prostitution sting operation after officers observed them associated with a room involved in the investigation, with federal trafficking charges possible. [32]

- In November 2012, a man was charged with trafficking girls, who were as young as 11 and 12 years old, at a Choice property in Kansas.[33]

- In August 2013, two people were charged with sex trafficking of children by force or coercion after they recruited and harbored a 16-year-old girl and kidnapped a 19-year-old girl for prostitution at a Choice Property in South Carolina.[34]

- In April 2014 a man was arrested for human trafficking young women at a Choice Property in Florida.[35]

- In May 2014 a man was sentenced to 12 years in prison for sex trafficking a child after being arrested at a Choice Property in Pennsylvania when he was accompanying a minor to a date.[36]

- In February 2015 a 17-year-old girl was being used as a prostitute at a Choice Property in Massachusetts before police were able to arrest her pimp and return her to state custody.[37]

---

[27] Julie Manganis, *Man Arraigned in Prostituting Teens Case*, **SALEM NEWS** (Beverly, Mass.), Oct. 29, 2011, available at: https://plus.lexis.com/api/permalink/e88a4e80-70bf-48c9-bde5-a251f30e5da7/?context=1530671

[28] https://www.wsfa.com/story/23118431/shock-after-man-charged-with-human-trafficking-of-girl-in-dothan/

[29] https://www.al.com/news/montgomery/2014/06/houston_county_judge_sentences.html

[30] https://www.al.com/news/birmingham/2017/01/sex_trafficking_survivor_files.html

[31] Madeline Buckley, *S.B. Man Accused in the Promoting of Prostitution*, **S. BEND TRIB.**, Mar. 1, 2013, at A4, available at: https://plus.lexis.com/api/permalink/bc93b702-077e-42f5-aaea-24199b3a72c6/?context=1530671

[32] Patrick Lohmann, *Trafficking Charges Possible*, **ALBUQUERQUE J.**, Sept. 4, 2011, at B4, available at https://plus.lexis.com/api/permalink/7311621d-bdcd-4a18-abde-2c459bf6ff43/?context=1530671

[33] https://www.kansas.com/news/local/crime/article1102606.html

[34] https://www.wistv.com/story/23048777/two-accused-of-sex-trafficking-children-denied-bond/

[35] https://archive.tcpalm.com/news/vero-beach-man-charged-with-human-trafficking--video-ep-456198732-341865991.html/

[36] https://www.fbi.gov/contact-us/field-offices/pittsburgh/news/press-releases/pittsburgh-man-sentenced-to-12-years-in-prison-for-sex-trafficking-of-a-child

[37] https://www.enterprisenews.com/story/news/2015/02/12/police-arrest-alleged-pimp-in/35171802007/

- In May 2015 two teenagers were rescued at a Choice Property in Alabama and a man was arrested for human trafficking.[38]

- In September 2015 a man was convicted and sentenced to one year and six months in state prison for attempting to pimp a woman at a Choice Property in California.[39]

- In October 2015 a man and woman faced felony charges after they coerced a 15-year-old girl into prostitution and held her at a Choice Property in North Carolina.[40]

- In June 2016 three people were charged with patronizing prostitution following a sting which was conducted at a Choice Property in Connecticut.[41]

- In September 2016 three people in Kentucky, including a police sergeant, were arrested in connection to a prostitution investigation that began when authorities received a complaint of a female being held against her will at the Choice Property.[42]

- In January 2017 two men pleaded guilty to human trafficking after running a prostitution ring out of a Choice Property in Mississippi.[43]

- In May 2017 a man was accused of human trafficking after running the operation out of a room at a Choice Property in Florida.[44]

- In May 2019 online sex advertisements led to the arrest of eight women, one of which was arrested at a Choice Property in Warner Robins, Georgia.[45]

- In April 2021, Billings, Montana officers responded to a report of possible commercial sex activity at a Choice Property which led to the conviction of a Wyoming man. [46]

- In March 2022 a woman was arrested for prostitution and drug charges at a Choice Property in Leesburg, Florida after undercover officers responded to her online ad.[47]

54.    These articles are only limited representative examples. There are many similar articles about sex trafficking and other associated criminal activity at Choice branded hotels.

---

[38] https://www.al.com/news/montgomery/2015/05/2_teenagers_recovered_south_ca.html

[39] https://orangecountyda.org/press/man-sentenced-to-prison-for-attempted-pimping-of-woman-after-having-her-meet-with-an-undercover-officer-whom-he-thought-was-sex/

[40] https://www.wsoctv.com/news/local/two-accused-coercing-teen-prostitution/27246974/

[41] https://patch.com/connecticut/newhaven/new-haven-men-arrested-prostitution-sting-operation-stratford

[42] https://clarksvillenow.com/local/oak-grove-police-sergeant-2-others-arrested-during-prostitution-investigation/

[43] https://www.wjtv.com/news/2-men-plead-guilty-in-human-trafficking-case/

[44] https://www.jacksonville.com/story/news/crime/2017/05/31/jacksonville-man-43-arrested-human-trafficking-charges/15757285007/

[45] https://www.13wmaz.com/article/news/warner-robins-police-warns-prostitution-can-lead-to-other-dangerous-crimes/93-9f0e65a8-ae4e-487d-a9fe-79db262cd8c4

[46] https://nbcmontana.com/news/local/wyoming-man-convicted-for-arranging-for-commercial-sex-in-billings

[47] https://www.leesburg-news.com/2022/03/24/woman-busted-on-prostitution-charge-at-hotel-in-leesburg/

Moreover, on information and belief, Chois is aware of additional significant law enforcement activity related to trafficking at its hotels that was not reported in the media.

55. Upon information and belief, Choice monitored criminal activity occurring at its branded hotels and was aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels, including the specific property where R.B. was trafficked.

56. Examples of online reviews that confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at Choice branded hotels include:

- A January 2006 review of a Choice Property in Orlando, FL states "Dirty, worn carpets with lumps underneath, no blankets on bed, "clean" towels with hair on them, cigarette stains on tubs, roaches in bathroom, stale smoke smell, no tissues, sink knob broken, security locks on doors broken off, poorly repaired hole in bathroom wall, bathroom door dragged on floor and would not shut all the way, hookers in the parking lot approaching members of our group. When i complained, especially about the hookers, I was told there wasn't much they could do and they would "pass on the complaints to the management."[48]

- A July 2006 review of a Choice Property in Oakland, CA states "we checked into room 219 (in the back of the motel) only to find numerous prostitutes and apparent pimps in the parking lot and some of the first floor rooms. I felt it was a very very unsafe environment and we moved to another motel after only one half hour in the room."[49]

- An August 2009 review of a Choice Property in Port Allen, LA states "Oh, yea. I was outside having a smoke aboug midnight when two prostitutes began knocking two doors down from us. It seems no one there wanted company, so they began hitting on me until they learned I was with my family."[50]

- A February 2010 review of a Choice Property in New Orleans, LA states "We checked in late at night following a long drive, not knowing that this hotel was in a seedy part of New Orleans. The parking lot was full of loiterers. There were obvious prostitutes in the lobby, and someone had recently vomited on the elevator. Only one of the lights in the bedroom worked - and there was no door knob on the bathrrom door. There were screams in the hallway during the night. This hotel is unsafe and not clean."[51]

---

[48] https://www.tripadvisor.com/Hotel_Review-g34515-d17803954-Reviews-Quality_Inn_Suites_Downtown-Orlando_Florida.html
[49] https://www.tripadvisor.com/Hotel_Review-g32810-d80444-Reviews-Quality_Inn_Oakland-Oakland_California.html
[50] https://www.tripadvisor.com/Hotel_Review-g40379-d92936-Reviews-Quality_Inn_Suites_Port_Allen-Port_Allen_Louisiana.html
[51] https://www.tripadvisor.com/Hotel_Review-g60864-d93140-Quality_Inn-New_Orleans_Louisiana.html

- An August 2010 review of a Choice Property in Toledo, OH states "Two 19 year olds were shot in the middle of the night at the convenience store next door and a hooker was sitting on the curb out front of the hotel waiting for "a ride" when we left. This place was a real bummer."[52]

- A November 2010 review of a Choice Property in New Orleans, LA states "I stayed with a colleague for 1 night on a business trip in the area before checking into another hotel because I was disgusted. There were prostitutes working the hotel that knocked on our door and pretty sure drugs were being sold right out of the room beside mine."

- A May 2011 review of a Choice Property in Atlanta, GA states "When the security lights went out a prostitute and several thugboys started working the parking lot of the hotel.. I specifically told the manager that I never want to stay away from security again."[53]

- An August 2011 review of a Choice Property in New Orleans, LA states "We got a room in January 2011, on the ground floor, and it had a stench to it that smelled like someone forgot to take their clothes out of the washer. There were people going into the room next to us that were very suspicious. They were yelling & swearing and we think they were pimps or drug dealers, because we heard one of them yelling at a female telling her that "this is the way I make my money." Needless to say, we left and got our money back. Scary!"[54]

- A 2011 review of a California Choice property states: "We arrived and there were prostitutes and the place was trashed. We didn't even check in. Four of the five cabs wouldn't pick us up from this location."[55]

- A March 2012 review of a Choice Property in Payson, UT states "Dirty rooms, rude staff, worst hotel experience ever. And for some reason there were a lot of police cars in the parking lot and they were asking women if they were prostitutes. I wish I was making that up. Apparently it's a good place to get an afternoon delight and Payson is prostitute heavy. I'd never been to Payson before but I didn't think a small town would have this problem. I left as soon as I could in the morning to avoid any officers and/or prostitutes."[56]

- A 2012 review of a Florida Choice property states: "During my stay here everytime I would go outside I was approached by someone wanting to bum a cigarette or wanting to sell me or buy drugs. The staff here are extremely rude to say the least. When I questioned why all the drug dealers and prostitutes I was told by a member of the hotel staff because business is slow."[57]

[52] https://www.expedia.com/Toledo-Hotels-Quality-Inn-Alexis-Rd.h40044.Hotel-Reviews
[53] https://www.expedia.com/Atlanta-Hotels-Quality-Inn-Atlanta-Northeast-I-85.h15487.Hotel-Reviews
[54] https://www.tripadvisor.com/Hotel_Review-g60864-d93140-Quality_Inn-New_Orleans_Louisiana.html
[55] https://www.tripadvisor.com/Hotel_Review-g32767-d729348-Reviews-Rodeway_Inn_National_City-National_City_California.html
[56] https://www.yelp.com/biz/quality-inn-payson
[57] https://www.tripadvisor.ca/Hotel_Review-g34141-d84259-Reviews-Rodeway_Inn_Clearwater_Largo-Clearwater_Florida.html

- A February 2013 review of a Choice Property in Downey, CA states "Be aware that there is the potential for some undesirable people around the property. One night we had a drunken woman screaming the the parking lot that she was going to kill herself. Two mornings later we saw what appeared to be a prostitute waiting for visitors in her room with the door proped open half way."[58]

- June 2013 review of a Choice Property in Lester, PA states "You want a room in the front/lit area. Do NOT take a room in the back/unlit area. We parked there (briefly) and there were people on the balcony/aisle drinking. I mentioned this to the clerk and was told that the back of the building is for the cash customers. I am fairly sure he meant hookers."[59]

- July 2013 review of a Choice Property in Fresno, CA states "I am pretty sure there was prostitute "working" from the parking lot and I believe she was using the hotel, ew! I brought this to the staffs attention when we were checking out and she just looked at us and said " oh yeah"."[60]

- October 2013 review of a Choice Property in Atlanta, GA states "…sketchy security foot patrol

  hookers come and go parking lot has sketchy characters at night recurring smell of drugs…"[61] Hotel management responded to this review on October 7, 2013

- February 2014 review of a Choice Property in San Diego, CA states "I had to stay here for a month for business costs. There was a hooker getting the work done on her what seemed as loud as possible as it happened on at least 5 occasions that woke me from mid sleep. The room had an awful dirty dingy Angel to it. Oh and btw it is located in pretty much a ghetto as with the hooker."[62]

- April 2014 review of a Choice Property in Charleston, SC states "We had a 2 inch gap underneath our door when it was completely shut, a spider was on the wall. Along with bugs in the framed art, there was obvious prostitution and a dead lizard in the corner. Never go here this place is horrid."[63]

- November 2014 review of a Choice Property in Vacaville, CA states "This place is a seedy as they come. Pulled up to the room after being on the road for 8 hrs with our kids and realized most of the clientele was either going to or coming from the shady bar in the parking lot. All night people were loud, I swear there was some prostitution going on. My kids were up scared from all the yelling. They finally fell

[58] https://www.tripadvisor.com/Hotel_Review-g32308-d76773-Reviews-Quality_Inn_Near_Downey_Studios-Downey_California.html

[59] https://www.tripadvisor.com/Hotel_Review-g53021-d3491361-Reviews-Quality_Inn_Philadelphia_Airport-Lester_Pennsylvania.html

[60] https://www.yelp.com/biz/quality-inn-and-suites-fresno-northwest-fresno

[61] https://www.tripadvisor.com/Hotel_Review-g60898-d86271-Reviews-Quality_Suites_Atlanta_Buckhead_Village_North-Atlanta_Georgia.html

[62] https://www.tripadvisor.com/Hotel_Review-g60750-d83092-Reviews-Quality_Inn_San_Diego_I_5_Naval_Base-San_Diego_California.html

[63] https://www.expedia.com/Charleston-Hotels-Quality-Inn-Charleston-Gateway.h24247.Hotel-Reviews

asleep about 1am and thanks god they did bc around 3 the husband and I woke to very loud sex noises coming from the room next to ours."[64]

- February 2015 review of a Choice Property in Spokane, WA states "On the first weekend we were there and after returning to the hotel around 10:00 pm we were walking down the hallway entrance to the elevators and approaching us were three apparent prostitutes. The older one made the statement to the two younger ones that "you better not turn down anything tonight" end quote. They walked right by the front desk to get to the front exit door. Any facility that promotes and allows such things to occur in their family oriented facility is not where I will ever bring my family back again."[65] Hotel management responded to this review on February 5, 2015.

- April 2015 review of a Choice Property in Riverside, CA states "On our third night we were graced by a hooker and a John who didn't even know her name on the side of us. We heard multiple drug deals happen, and I'm not talking about weed... Then they started to fight loudly in the room then took it right outside of our door. I didn't know whether to call the cops or hit the floor."[66]

- May 2015 review of a Choice Property in Winston Salem, NC states "Wasn't even there 5 minutes after checking in with my sons, when someone was soliciting prostitution to us. Mind you, my kids are 15 and 16 year olds. In other words offering us services."[67]

- September 2015 review of a Choice Property in Killeen, TX states "I would recommend you stay far from this hotel! Also there is prostitution going on here and it harbors the wrong type of people."[68]

57. These reviews are limited representative examples. There are many similar online reviews for Choice branded hotels, and, on information and belief, there are additional similar reviews and other customer complaints from in and before R.B.'s trafficking period that are not currently available on the internet, but which Choice know about due to monitoring reviews for its branded hotels.

58. Choice's public statements regarding trafficking confirm that it was, at all relevant times, aware of the problem in the hospitality industry and in its own hotels. For example:

---

[64] https://www.yelp.com/biz/quality-inn-and-suites-vacaville?start=80
[65] https://www.tripadvisor.com/Hotel_Review-g58759-d225255-Reviews-or700-Quality_Inn_Downtown_4th_Avenue-Spokane_Washington.html
[66] https://www.yelp.com/biz/quality-inn-riverside-near-ucr-and-downtown-riverside
[67] https://www.expedia.com/Winston-Salem-Hotels-Quality-Inn-University.h26374.Hotel-Reviews
[68] https://www.expedia.com/Killeen-Hotels-Quality-Inn.h4655354.Hotel-Reviews

- Choice's Board of Directors has been discussing human trafficking issues since at least 2008 when they adopted a Human Rights Policy that condemns human trafficking and publicly commits to raising awareness among hotel staff about trafficking in its hotels.

- In 2009, Choice faced public outcry including a Change.org petition as a result of the child sex trafficking occurring in its hotels. In 2010, the petition was updated to state "Choice Hotels has agreed to take important and proactive steps to protect children from child prostitution and sexual exploitation."[69]

- Choice has publicly claimed that it started supporting Polaris, a leading non-profit in the fight against trafficking, in 2010. On information and belief, prior to R.B.'s trafficking period, Choice had reviewed and was familiar with Polaris publications regarding trafficking in the hospitality industry, which include detailed recommendations for how hotels can avoid facilitating trafficking.

- On information and belief, in November 2010, Choice publicly claimed to be partnering with ECPAT-USA to develop a training module to educate hotel management and staff in the prevention of sex trafficking. Unfortunately, Choice delayed for years before implementing anti-trafficking training at its hotels, at the expense of victims like R.B.

59. Despite its awareness of the problem of sex trafficking, Choice continued to operate in ways that it knew or should have known would facilitate ongoing sex trafficking at its hotels and, therefore, continued to financially benefit from the use of its hotels for the trafficking of victims.

60. News stories, online reviews, guest complaints, public statements, and law enforcement efforts establish that, at the time R.B. was trafficked at the College Park Comfort Inn, Choice knew or should have known:

      **a.** The use of Choice branded properties for sex trafficking was not limited to one location or geographic region but was a widespread problem;

      **b.** Commercial sex work occurring at Choice branded properties involved trafficking and compelled prostitution;

      **c.** Choice franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at Choice hotel properties;

---

[69] https://www.change.org/p/tell-choice-hotels-to-prevent-child-prostitution-in-their-hotels

    **d.** Their efforts, if any, to stop facilitating sex trafficking in Choice branded properties were not effective; and

    **e.** Choice was, by acts and omissions, facilitating sex trafficking at Choice branded properties by providing venues where that trafficking was occurring widely and without sufficient detection or deterrence.

61. Despite the continually mounting evidence that sex trafficking at Choice branded properties was ongoing and growing, Choice did not change course. Choice chose to continue earning revenue by allowing their hotels to serve as venues for trafficking.

**IV. Choice and Choice Franchisee had actual and/or constructive knowledge of sex trafficking at the College Park Comfort Inn, including R.B.'s trafficking.**

62. Sex trafficking, commercial sex, and other associated criminal activity were prevalent at the College Park Comfort Inn.

63. The College Park Comfort Inn was in a high crime area known to be at heightened risk for commercial sex and sex trafficking.

64. No later 2008, the prevalence of child sex trafficking in the Atlanta area, and the role of hotels as a venue for this trafficking, was well recognized.[70] In 2011, there was a large sting operation a motel in the Old National Highway corridor, authorities described as a "a haven for illicit activity."[71]

65. By 2013, it was known that as many as 90 percent of teenage runaways in the Atlanta area became victims of the sex trade.[72]

66. Law enforcement dispatch records reflect a high level of commercial sex and other criminal activity associated with sex trafficking at the College Park Inn before, during, and after R.B.'s trafficking period.

---

[70] https://www.senate.ga.gov/sro/Documents/StudyCommRpts/08JtSexualExploitationMinors.pdf
[71] https://www.wsbtv.com/news/police-nab-17-prostitution-sting/241732124/?utm_source=chatgpt.com
[72] https://thesoutherneronline.com/8162/news/missing-girl-sparks-search-sex-trafficking-common-in-atlanta/

67. There were other victims being trafficked at the College Park Comfort Inn at the same time as R.B. Her trafficker often trafficked her together with another victim, and she understood he was also trafficking other women at the hotel who she did not directly interact with. R.B. also understood that other traffickers were operating at this hotel.

68. Upon information and belief, there were multiple trafficking victims exploited at the College Park Comfort Inn prior to R.B.'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who were not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others.

69. During the period that R.B. was trafficked at the College Park Comfort Inn, there were obvious signs associated with her sex trafficking:

   a. R.B. was a minor at the time of her trafficking. She and other girls her trafficker was victimizing were often present with her trafficker at check in and hotel staff would have observed that R.B. was clearly under the age of 18 and was with an older man she was not related to.

   b. R.B. wore provocative, revealing clothing that was not appropriate for her age.

   c. R.B. would be in the hotel during regular school days despite the fact that she was and looked like a high schooler who should have been in school.

   d. The rooms where R.B. was trafficked were frequently paid for with cash.

   e. R.B.'s trafficker often rented multiple rooms.

23

f. When staying multiple days, they would often pay for the rooms one day at a time, returning to the front desk to pay cash to extend the rental until R.B.'s trafficker decided it was time to move on.

g. Multiple other girls were being trafficked at the same hotel at the same time as R.B. by her trafficker and by multiple traffickers. At least 3 other girls were also minors. Collectively they would see up to fifty johns per day.

h. R.B.'s trafficker beat her and left bruises and marks on her skin that were visible to anyone looking at her.

i. R.B. had visible signs of being branded by her trafficker.

j. R.B. saw up to eight johns per day. They would wait in the parking lot for the previous john to exit.

k. Immediately after she saw a john, the trafficker would go up to her room to collect the money. The hotel staff saw him go up and down many times a day without R.B.

l. Staff at the College Park Comfort Inn saw R.B. arrive and leave with her trafficker.

m. The "do not disturb" signs was used frequently and at times R.B.'s trafficker would have one of his associates positioned outside the door.

n. Housekeeping came in every day to clean and they would have noticed sex paraphernalia like condom wrappers and drug paraphernalia.

o. Extra towels were requested frequently.

p. There were obvious signs of drug use, including the smell of weed.

q. Despite her youth, R.B. would often be intoxicated or high while at the hotel.

r. There was heavy foot traffic in and out of R.B.'s room involving men who were not hotel guests. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

s. There were loud altercations in the rooms that would have been audible to hotel staff in the vicinity, such as housekeeping staff.

t. R.B. would be kept at the College Park Comfort Inn for several days at a time, moving on to another hotel only once her trafficker decided.

u. Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel.

24

70. Hotel staff performing their ordinary job functions observed or were otherwise made aware of these obvious signs of R.B.'s trafficking.

71. All knowledge from the staff at the College Park Comfort Inn is imputed to Choice Franchisee, which employed the hotel staff. Thus, Choice Franchisee knew about or was willfully blind to the widespread and ongoing trafficking at the College Park Comfort Inn, including the trafficking of R.B., through the direct observations of hotel staff.

72. The knowledge of the hotel staff is also imputed to Choice based on the existence of an agency relationship as described below.

73. Upon information and belief, Choice Franchisee also knew about or was on notice of the sex trafficking, commercial sex, and related criminal activity at the College Park Comfort Inn, including R.B.'s trafficking, based on the tools that it used to supervise and oversee the hotel, including but not limited to:

    a. surveillance of the property;
    b. internal investigations;
    c. customer complaints;
    d. monitoring of customer feedback;
    e. information received from law enforcement; and
    f. other sources of non-public information available to Choice Franchisee.

74. Upon information and belief, Choice also was on notice of the sex trafficking, commercial sex, and related criminal activity at the College Park Comfort Inn based on the tools that it used to supervise and oversee the hotel, including but not limited to:

    a. Choice's monitoring of online reviews;
    b. Choice's monitoring of news report regarding criminal activity at Choice hotels;
    c. Choice's regular, unannounced inspections of the College Park Comfort Inn;
    d. Information obtained by Choice's field-based associates that visited the College Park Comfort Inn;

e. Choice's involvement in soliciting, monitoring, analyzing, and responding to guest surveys and complaints;

f. Detailed reporting requirements that Choice imposed on Choice Franchisee;

g. Choice's capture, retention, and analysis of extensive data about guest and hotel operations through the the backend of systems it required Choice Franchisee to use at the College Park Comfort Inn;

h. Choice Franchisee reporting criminal activity at the College Park Comfort Inn to Choice;

i. information Choice received from law enforcement; and

j. other sources of non-public information available to Choice.

75. Defendants also knew or should have known about the trafficking at the College Park Comfort Inn, including R.B.'s trafficking, based on obvious pattern of readily observable red flags associated with that trafficking and the other methods, listed above, that they used to monitor and supervise the College Park Comfort Inn.

76. Choice Franchisee had at least constructive knowledge of R.B.'s trafficking, as a result of its knowledge of the problem of sex trafficking in the hotel industry and throughout Choice hotels, its knowledge of the red flags of trafficking and how to detect and avoid facilitating trafficking in hotels, and its failure to exercise ordinary care in response to the known problem of sex trafficking and the obvious red flags of trafficking at the College Park Comfort Inn.

77. Choice had at least constructive knowledge of the sex trafficking at the College Park Comfort Inn, including R.B.'s trafficking, as a result of Choice's knowledge of the problem of sex trafficking in the hotel industry and throughout Choice hotels, its knowledge of the red flags of trafficking and how to detect and avoid facilitating trafficking in hotels, its retained control over relevant aspects of hotel operations, and its failure to exercise ordinary care in response to the known problem of sex trafficking and the obvious red flags of trafficking at the College Park Comfort Inn.

78. Defendants had constructive knowledge of R.B.'s trafficking because the red flags of this trafficking were sufficiently numerous, obvious, and readily observable that a hotel exercising ordinary diligence would have detected or deterred from her trafficking and would not have benefited from facilitating her trafficking.

79. But for Choice's failure to exercise ordinary diligence when operating, managing and controlling the College Park Comfort Inn, including when exercising control over staff training and response to suspected criminal activity on property, R.B.'s trafficking would have been detected or deterred. Thus, constructive knowledge of R.B.'s trafficking is imputed to Choice.

**V. Defendants actively facilitated sex trafficking at the College Park Comfort Inn, including the trafficking of R.B.**

**A. Choice Franchisee facilitated the trafficking activity at the College Park Comfort Inn, including the trafficking of R.B.**

80. Choice Franchisee is responsible for the acts, omissions, and knowledge of employees of the College Park Comfort Inn when operating these hotels because these acts and omissions were committed in the scope and course of employment, because Choice Franchisee ratified these acts and omissions, and because Choice Franchisee failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Choice Franchisee, of human trafficking occurring in the College Park Comfort Inn.

81. Choice Franchisee participated in the harboring of R.B. and other victims at the College Park Comfort Inn by continuing to provide rooms in which these victims were held, maintained, provided, despite at least willful blindness to the fact that sex trafficking was occurring at College Park Comfort Inn.

27

82. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the College Park Comfort Inn, Choice Franchisee continued renting rooms for use in trafficking, providing traffickers with a safe haven and operating the hotel in ways that enabled and facilitated sex trafficking activity.

83. While Choice Franchisee at least should have known of the activity that resulted in R.B.'s trafficking, it continued to rent rooms used for that trafficking.

84. Choice Franchisee also facilitated widespread trafficking at the College Park Comfort Inn, including the trafficking of R.B., in ways including:

   a. developing relationships with traffickers, including R.B.'s trafficker, and creating an understanding that these traffickers could operate at the hotel without risk of interference;

   b. continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of R.B. and other victims;

   c. allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

   d. inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

   e. failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

   f. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff; and

   g. providing these traffickers with the cover of a legitimate business where they could operate without having to divert significant time and resources to avoid detection or interference by hotel staff.

85. Choice Franchisee's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including R.B.

86. Choice Franchisee knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

**B. Choice facilitated the trafficking activity at the College Park Comfort Inn, including the trafficking of R.B.**

87. Choice participated directly in aspects of the operation of the College Park Comfort Inn that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to the trafficking of R.B., as follows:

a. assuming joint responsibility with the franchisee for detecting and preventing human trafficking at the hotel property;

b. assuming or retaining control over and responsibility for training hotel staff on detecting and responding to human trafficking;

c. assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to human trafficking;

d. employing field-based associates who work with hotels on trafficking issues;

e. assessing or auditing hotel properties, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place;

f. establishing systems for guests to report security issues to Choice;

g. requiring franchisees to provide Wi-Fi/internet access to guests;

h. mandating the specific tools and systems that franchisees must use to provide Wi-Fi/internet access to guests;

i. setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage;

j. requiring franchisees to use a system to monitor and track housekeeping requests;

k.  setting policies for when and how housekeeping services are provided; and

l.  collecting and monitoring data that shows patterns of use of housekeeping services.

88.  Choice played a central role in renting rooms at the College Park Comfort Inn by, among other things:

a.  controlling all details of the guest reservation, check-in, and payment processes through its management of and control over all systems used for those processes and through its adoption and enforcement of detailed and specific policies dictating the means and methods used for the day-to-day implementation of these processes;

b.  directly taking reservations for rooms at the College Park Comfort Inn and accepted payment for those rooms through a central reservation system ("CRS") that it controlled and operated;

c.  making reservations and take payment for rooms at the College Park Comfort Inn without any involvement or approval by Choice Franchisee;

d.  directly entering into agreements with third parties regarding the distribution of room inventory in its branded hotels, including its franchised hotels;

e.  when a guest did not make a reservation in advance through the CRS, nonetheless controlling the specific process used to register a walk-in guest and generate a reservation for that guest;

f.  setting or otherwise controlling room prices, required discounts, and reward programs;

g.  controlling and maintaining ownership in all data related to room rentals;

h.  controlling and restricting the ability of Choice Franchisee and hotel staff to refuse or cancel a reservation;

i.  establishing detailed policies and protocols that dictated, step-by-step, everything that would happen from the time a guest arrived at the College Park Comfort Inn until they entered their guest room, including operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in;

j.  requesting Choice Franchisees to use the Choice ADVANTAGE property management system, which was owned, maintained, and controlled by Choice  for virtually all aspects of hotel operations related to room rentals;  and

**k.** maintaining back-end access to the Choice ADVANTAGE property management system, which it used to collect, track, and report comprehensive information about each guest at the College Park Comfort Inn.

89. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the College Park Comfort Inn, Choice continued renting rooms to traffickers pursuant to their venture, including the rooms used to sexually exploit R.B.

90. Choice directly participated in a business relationship with traffickers at the College Park Comfort Inn, including R.B.'s traffickers, through its central role in the rental of rooms, its control and oversight over customer and operational data from the College Park Comfort Inn, and its control over relevant aspects of hotel operations at the College Park Comfort Inn.

91. Choice at least should have known that it was facilitating trafficking at the College Park Comfort Inn and, despite this, benefited from continued association with traffickers at this hotel, including R.B.'s trafficker, by providing them hotel rooms and related services that facilitated R.B.'s trafficking.

92. On information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at its hotels including the College Park Comfort Inn, Choice used its retained control over and direct involvement in hotel operations to facilitate trafficking, including by:

**a.** adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers, including R.B.'s trafficker, to secure rooms without providing their own identifying information;

**b.** adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers, including R.B.'s trafficker, to pay for rooms using non-traceable methods;

**c.** adopting and enforcing training methods for the franchisee and hotel staff in a way that led to widespread and ongoing trafficking at the hotel property;

31

**d.** adopting and enforcing policies and protocol regarding trafficking in a way that led to widespread and ongoing trafficking at the hotel property;

**e.** providing traffickers continued access to Choice-maintained internet systems despite having or constructive knowledge this access was being used for advertising services related to their trafficking activities;

**f.** adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of Choice Franchisee and hotel staff related to human trafficking at the College Park Comfort Inn; and

**g.** implicitly or explicitly encouraging Choice Franchisee to continue facilitating trafficking by continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking.

93. R.B.'s trafficker was able to operate without interference and without making significant effort at a concealment during repeated visits to the College Park Comfort Inn over an extended period because Choice adopted, implemented, enforced, and used policies and practices that facilitated sex trafficking and minimized the risk of detection and traceability.

94. Choice's acts and omissions, which result from a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including R.B.

95. Choice knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

**VI. Choice and Choice Franchisee's ventures at the College Park Comfort Inn.**

96. Choice Franchisee and Choice each benefited from use of the College Park Comfort Inn for sex trafficking. R.B.'s trafficker and other traffickers rented rooms at the College Park Comfort Inn and used the hotel to harbor, maintain, and provide victims including R.B. When these traffickers rented rooms, both Choice Franchisee and Choice received a financial benefit:

a. Choice Franchisee generated revenue every time a sex trafficker rented a room at the College Park Comfort Inn, both from room rental fees and from fees for other hotel services.

b. Choice generated substantial income from operation of the College Park Comfort Inn. As a result of its role in hotel operations, Choice received a share of the revenue from room rentals collected at the College Park Comfort Inn. The fees generated by Choice are primarily based on gross room rentals; therefore, Choice's revenue increased with each room rental at the College Park Comfort Inn.

c. Choice also benefited from sex traffickers' frequent use of the College Park Comfort Inn because this regular and routine use of the hotel increased the hotel occupancy rate, and an increase in the hotel occupancy rate resulted in several benefits for Choice, including that this assisted them in obtaining financing and helped them market franchising opportunities to potential franchisees.

97. In ways more fully described above, Choice and Choice Franchisee knowingly benefited from participating in a venture with traffickers who regularly operated at the College Park Comfort Inn, including R.B.'s traffickers ("Venture 1").

98. Both Choice and Choice Franchisee participated in this venture through their respective roles in the business relationship that formed between the College Park Comfort Inn and these traffickers. This business relationship involved mutual pursuit of benefit: Defendants earned revenue and other benefits from room rentals, while traffickers used those rooms to generate income from commercial sex. This business relationship developed as follows:

a. R.B.'s trafficker operated out of hotels, such that a hotel venue where he could harbor, maintain, and provide R.B. and other victims was a crucial component of his business model.

b. Choice Franchisee and Choice facilitated and enabled sex trafficking at the College Park Comfort Inn in the ways described above.

c. R.B.'s trafficker came to understand that policies and practices at the College Park Comfort Inn would minimize the risk of detection and traceability, facilitating their operations.

d. R.B.'s trafficker developed an understanding that hotel staff would turn a blind eye and thus were able to operate without diverting time and resources to avoiding inference by hotel staff.

**e.** R.B.'s trafficker repeatedly returned to this same hotel and was able to attract business due to the low-risk environments for sex buyers.

99. Choice Franchisee participated in this continuous business relationship through its "boots-on-the-ground" control over daily operations at the College Park Comfort Inn. Choice participated through their centralized control of reservations and their direct role in policies and training related to detecting and responding to sex trafficking as further described above.

100. This continuous business relationship facilitated, assisted, and supported traffickers' illegal operations, including their trafficking of R.B. Together, Choice and Choice Franchisee not only provided traffickers with a physical venue but also the cover of a legitimate business, enabling them to profit from sexual exploitation without meaningful risk of detection. Defendants also allowed unregistered male sex buyers to enter and exit freely without identification, helping traffickers attract customers and minimize law-enforcement exposure. The conduct of both Choice and the Choice Franchisee thus facilitated trafficking at the College Park Comfort Inn.

101. In ways described more fully above, Choice and Choice Franchisee also knowingly benefited from participating together in a hotel-operating venture at the College Park Comfort Inn that facilitated ongoing sex trafficking, including the trafficking of R.B. (hereinafter "Venture 2").

102. Venture 2 is a commercial hotel-operating venture that resulted from a longstanding business relationship between Choice Franchisee and Choice that centered on operation of the College Park Comfort Inn. This undertaking involved shared goals of maximizing gross room revenue and increasing room occupancy rates.

103. Choice Franchisee Franchise and Choice each participated in this commercial undertaking through their respective roles in hotel operations as further described above. Each of

34

these Defendants was directly involved in aspects of operations that facilitated sex trafficking at the hotel and continued to operate the hotel in the same manner despite actual or constructive knowledge that this was facilitating sex trafficking.

104. There were TVPRA violations within the scope of Venture 2 because the hotel at the center of the venture, the College Park Comfort Inn, was used to harbor, maintain, provide, and exploit many trafficking victims, including multiple victims of R.B.'s trafficker and R.B. herself. There were also TVPRA violations with the scope of Venture 2 through Choice Franchisee's violations of 18 U.S.C. §1591(a) as a perpetrator.

**VII. Choice Franchisee and the Staff at the College Park Comfort Inn Acted as Choice's Agents.**

105. Choice is vicariously liable for the acts, omissions, and knowledge of Choice Franchisee and hotel staff, which acted as Choice's actual agents or subagents when operating the College Park Comfort Inn.

106. Choice subjected and retained the right to subject the Choice Franchisee to detailed requirements regarding the operation of the College Park Comfort Inn. These detailed requirements came from written agreements, manuals, policies, protocols, directives, and mandates that Choice imposed through its ongoing control of hotel operations.

107. Choice obscure the full extent of control it exercises over the Choice Franchisee by treating these manual, policies, and directives as confidential and proprietary and guarding against public disclosure. On information and belief, the requirements that that Choice imposed on the Choice Franchisee:

        a. did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Choice Franchisee used at the College

Park Comfort Inn, such as telling hotel staff step-by-step how to perform tasks at the hotel and mandating that Choice Franchisee use tools and products selected and controlled by Choice;

b. covered virtually all aspects of hotel operations, including internal operating functions, such as human-resources issues and accounting and finance practices;

c. dictated the specific ways that Choice Franchisee and hotel staff were required to carry out day-to-day functions;

d. required the use of Choice's owned, operated and controlled reservation and operation systems software and hardware; and

e. significantly exceeded what was necessary for Choice to protect their trademarks.

108. In addition to the ways described above, on information and belief, Choice exercised and reserved the right to exercise systemic and pervasive control over Choice Franchisee's day-to-day operation of the College Park Comfort Inn, including in the following ways:

a. requiring Choice Franchisee and management of the College Park Comfort Inn to participate in mandatory training programs, both during onboarding and on an annual basis, including regarding aspects of hotel operations that go significantly beyond what would be necessary trademark protection;

b. retaining the right to mandate and control training for hotel staff and actually mandated and controlling training for hotel staff on topics it selected;

c. controlling the details of training conducted for hotel staff by Choice Franchisee by requiring the use of standardized training methods and materials, including developing online, role-specific training that Franchisees was required to use;

d. adopting detailed job descriptions for each position at the College Park Comfort Inn and drafting numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

e. setting required staffing levels for the College Park Comfort Inn;

f. exercising significant control over the procurement decisions of Choice Franchisee by requiring it to buy products from "qualified vendors" and limiting its ability to purchase products from other vendors;

g. imposing detailed requirements for all aspects of hotel facilities;

h. controlling channels for guests to report complaints or provide feedback regarding the College Park Comfort Inn and directly participating in the response and/or supervising and dictating Franchisee's response to customer complaints or other feedback;

i. requiring the College Park Comfort Inn to participate in a mandatory guest complaint resolution system operated, managed, and overseen by Choice;

j. requiring Choice Franchisee to join and participate in a Franchisees association;

k. controlling all marketing for the College Park Comfort Inn, including all website pages, and prohibited Franchisee from using any website, social media, advertising, or other public communication without written approval;

l. requiring Choice Franchisee to refer all guests who it could not accommodate to other Choice hotels;

m. requiring Choice Franchisee to purchase insurance and set specific requirements for that insurance;

n. imposing detailed recordkeeping and reporting requirements on Franchisee regarding virtually all aspects of hotel operation;

o. collecting and monitoring dozens of reports regarding the College Park Comfort Inn through the backend of the Choice Brand Choice ADVANTAGE property management system and used these reports to supervise and control the day-to-day operations of the College Park Comfort Inn;

p. collecting, monitored, and analyzed guest information in two separate systems: the CIS (Customer Information System) and the GIS (Guest Insight System) through the backend of the Choice Brand Choice ADVANTAGE property management system and using this information to supervise the College Park Comfort Inn;

q. retaining the virtually unlimited right to supervise the day-to-day operations of the College Park Comfort Inn by retaining the right to implement any automatic reporting systems it elected to use;

37

**r.** retaining the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations;

**s.** retaining the right to inspect the College Park Comfort Inn, including through unannounced inspections;

**t.** retaining the right to impose penalties, including but not limited to written warnings, payment of re-inspection, non-compliance, and guest satisfaction fees, attendance at mandatory training programs and ultimately to the termination of the franchise agreement for violations of any rule, policy, or standard; and

**u.** other actions that deprived Choice Franchisee of independence in the business operations of the College Park Comfort Inn.

109. As further described above, Choice specifically retained and exercised control over the aspects of hotel operations at the College Park Comfort Inn that caused or contributed to R.B.'s harm, including but not limited to: rental of rooms, relevant policies (including payment method accepted, identification requirements, and hotel access for individuals who are not registered hotel guests) hotel security, employee training, and detection of and response to suspected sex trafficking.

## VIII. The Choice Brand Defendants are jointly responsible for the trafficking of R.B.

110. Upon information and belief, the rights and obligations concerning the franchising, operation, supervision, and control of the College Park Comfort Inn were shared and jointly exercised by the Choice Brand Defendants.

111. Upon information and belief, at all relevant times, the Choice Brand Defendants shared corporate headquarters, corporate officers, employees, and other resources relating to the franchising, operation, supervision, and control of the College Park Comfort Inn.

112. Upon information and belief, at all relevant times, the Choice Brand Defendants acted jointly to develop, implement, and enforce policies, procedures, and brand standards

38

applicable to the College Park Comfort Inn; to participate in and supervise day-to-day operations; and to authorize and profit from the rental of rooms at the hotel.

113. Upon information and belief, each of the Choice Brand Defendants shared in and benefited from revenues generated through the franchising, operation, and control of the College Park Comfort Inn, and each received a direct financial benefit when rooms at the property were rented to traffickers.

114. Upon information and belief, each of the Choice Brand Defendants, through its own acts and omissions and through its joint acts and omissions with the other Choice Brand Defendants, knowingly benefited from participation in a venture that it knew or should have known was engaged in violations of the TVPRA.

115. Moreover, upon information and belief, the Choice Brand Defendants participated in a joint venture with one another with respect to the franchising, operation, and control of the College Park Comfort Inn. The Choice Brand Defendants, as corporate affiliates subject to common ownership and control, engaged in a joint enterprise involving a shared commercial purpose, profit-sharing, a community of interest, and joint rights of control and management, and are therefore vicariously liable for the acts and omissions of one another that resulted in the trafficking of R.B.

### CAUSES OF ACTION—SEX TRAFFICKING UNDER THE TVPRA

116. R.B. incorporates all other allegations.

**I.** **Cause of Action: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C. §1591(a) (Choice Franchisee)**

117. R.B. is a victim of sex trafficking within the meaning of § 1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

118. Choice Franchisee is a perpetrator within the meaning of 18 U.S.C §1595(a) because it:

a. violated 18 U.S.C. §1591(a)(1) when, through the acts and omissions described throughout this Complaint, it harbored individuals (including R.B.) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at the College Park Comfort Inn.

b. violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, they knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C. §1591(a)(1) at the at the College Park Comfort Inn.

## II. Cause of Action: Beneficiary Liability under §1595(a) of the TVPRA (all Defendants).

119. R.B. is a victim of sex trafficking within the meaning of 18 U.S.C. §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C. §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA. R.B. is a victim of sex trafficking under 18 U.S.C. §§ 1591 and 1595(a) and is thus entitled to bring a civil action against any beneficiary who knowingly benefited from participation in a venture that the beneficiary knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

120. All Defendants are liable as beneficiaries under 18 U.S.C. § 1595(a).

121. **Venture 1:** Through acts and omissions more fully described throughout this Complaint, each Defendant received a financial benefit from participating in a venture with R.B.'s trafficker and other traffickers who regularly operated at the College Park Comfort Inn.

a. Venture 1 resulted from the development of a continuous business relationship between these traffickers and the College Park Comfort Inn, which formed when this hotel continued renting these traffickers rooms despite the obvious "red flags" of their sex trafficking activity and created an environment at the College Park Comfort Inn that facilitated their trafficking activities.

b. Each Defendant directly participated in this ongoing business relationship through their respective roles in operations—and specifically those aspects of operations that facilitated sex trafficking—at the College Park Comfort Inn. Through their participation, each Defendant facilitated and supported the activities of sex traffickers of R.B. and other traffickers at the College Park Comfort Inn.

c. Each Defendant benefited from its participation in this venture because it received increased revenue and other benefits described above when rooms at the College Park Comfort Inn were rented to traffickers, including R.B.'s traffickers.

d. This venture violated the TVPRA through the conduct of the traffickers who repeatedly harbored, maintained, provided, and exploited victims, including R.B., at the College Park Comfort Inn.

e. Each of the Defendants knew or should have known that Venture 1 was engaged in violations of the TVPRA based on the "red flags" associated with the illegal activities of R.B.'s traffickers and other traffickers regularly operating at the College Park Comfort Inn and because this trafficking would have been detected if the College Park Comfort Inn had been operated using reasonable diligence.

122. **Venture 2**: Through the acts and omissions more fully described above, each Defendant also participated in a commercial hotel-operating venture that facilitated widespread sex trafficking at the College Park Comfort Inn:

a. Venture 2 is a commercial venture resulting from the business relationship between the entities involved in operation of each of the College Park Comfort Inn for the mutual purpose of maximizing revenue, including gross room revenue.

b. Each Defendant participated in this venture through its role in operating the College Park Comfort Inn in ways that it knew or should have known was facilitating sex trafficking.

c. Choice also participated in this venture by (1) continuing the ongoing business relationship with Choice Franchisee despite actual or constructive knowledge the hotel was facilitating sex trafficking; (2) directly involving itself in and supporting aspects of hotel operations that Choice knew or should have known were facilitating trafficking at the hotel in ways described above; and (3) continuing to lend the perceived legitimacy of their brand and provide marketing services for the hotel after they knew or should have known the venture was engaged in violations of the TVPRA.

d. Each Defendant benefited from participating in Venture 2 as each derived revenue and other benefits from each room rented to a sex trafficker at the College Park Comfort Inn, including the rooms rented to the traffickers of R.B.

41

e. Venture 2 violated the TVPRA through the widespread sex trafficking that occurred at each the College Park Comfort Inn as victims—including R.B.—were harbored, maintained, provided, and exploited at this hotel. This venture also violated the TVPRA through the conduct of Choice Franchisee, who violated 18 U.S.C. §1591(a) as a perpetrator.

f. Each Defendant knew or should have known that this hotel-operating venture was facilitating sex trafficking, including the activities of the traffickers of R.B.

## III. Cause of Action: Liability under 18 U.S.C. § 2255

123. While a minor, R.B. was a victim under 18 U.S.C. §1591 and is thus entitled to bring a civil action under 18 U.S.C. § 2255.

124. Choice Franchisee is liable to Plaintiff under 18 U.S.C. § 2255 because, as alleged above, it is a perpetrator under 18 U.S.C. §1591.

125. Each of the Defendants are liable to A.G.B. under 18 U.S.C. § 2255 because, as alleged above, each Defendant is liable as a beneficiary under 18 U.S.C. §1595(a).

## IV. Cause of Action: Vicarious Liability for Violations of TVPRA and §2255 (Choice).

126. An agency relationship existed between Choice and Choice Franchisee because, through the acts and omissions described more fully above, Choice exercised and retained the right to exercise pervasive control over Choice Franchisee and its operation of the College Park Comfort Inn, including the means and methods used for day-to-day operations of the hotel.

127. An agency relationship also existed between Choice and Choice Franchisee because Choice retained and exercised control over the specific aspects of hotel operations that caused R.B.'s harm.

128. Choice Franchisee committed TVPRA violations—as both a beneficiary and a perpetrator—and violations of 18 U.S.C. § 2255 within the scope of its agency relationship with Choice. Specifically, Choice Franchisee committed these violations while renting rooms at the

hotel and operating the hotel in a manner that facilitated sex trafficking. This results in vicarious liability for Choice.

129. Moreover, each of the Choice Brand Defendants is liable for the acts and omissions of the other Choice Brand Defendants with respect to the operation and franchising of the College Park Comfort Inn. On information and belief, the Choice Brand Defendants, who were corporate affiliates subject to common ownership and control and who shared employees and a single corporate headquarters, operated as a joint venture engaged in profit sharing and subject to mutual control regarding the operation of the College Park Comfort Inn. They operated as a single integrated enterprise and as alter-egos and/or agents of one another with respect to operation of the College Park Comfort Inn, making them vicariously liable for one another.

**TOLLING OF LIMITATIONS**

130. To the extent Defendants assert an affirmative defense of limitations, R.B. invokes the discovery rule.

131. As a result of her trafficking, including at the College Park Comfort Inn, R.B. endured mental, physical, and sexual abuse. During her trafficking, R.B. was under coercion and control of traffickers who abused and manipulated her while she was still a minor.

132. R.B. did not understand that she was being trafficked because her situation was being normalized to her given her life circumstances and she was being actively manipulated.

133. As a result of R.B.'s trafficking, she suffered significant consequences of her mental and emotional health, including depression, anxiety, complex PTSD, paranoia, panic attacks, and an adjustment disorder.

134. As a result of this coercion and control, and the persistent effects that R.B. suffered even after the active trafficking ended, R.B. was unable to understand her injuries and their legal

43

cause. Nor could she have discovered her injuries and their legal causes through the exercise of ordinary diligence within 10 years of when she filed this lawsuit. This was the direct result of R.B.'s trafficking, which Defendants facilitated.

135. To the extent Defendants assert an affirmative defense of limitations, R.B. invokes the doctrine of equitable tolling because, as a result of being trafficked as a minor, R.B. faced extraordinary circumstances, which arose through no fault of her own, that prevented her from discovering and pursuing her legal rights. These extraordinary circumstances were such that R.B. could not be expected, in the exercise of ordinary diligence, to discover or pursue her legal rights.

136. To the extent Defendants assert an affirmative defense of limitations, R.B. also invokes the continuing tort doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct that facilitated R.B.'s trafficking.

## DAMAGES

137. Defendants' acts and omissions, individually and collectively, caused R.B. to sustain legal damages.

138. Defendants are joint and severally liable for all past and future damages sustained by R.B.

139. R.B. is entitled to be compensated for personal injuries and economic damages, including:

    a. Actual damages (until trial and in the future)

    b. Incidental and consequential damages (until trial and in the future);

    c. Mental anguish and emotional distress damages (until trial and in the future);

    d. Lost earnings and lost earning capacity (until trial and in the future);

    e. Necessary medical expenses (until trial and in the future);

f.  Life care expenses (until trial and in the future);

g.  Physical pain and suffering (until trial and in the future);

h.  Physical impairment (until trial and in the future);

i.  Emotional impairment (until trial and in the future);

j.  Exemplary/Punitive damages;

k.  Attorneys' fees; and

l.  Costs of this action.

m.  Pre-judgment and all other interest recoverable.

## JURY TRIAL

140.  R.B. demands a jury trial on all issues.

## RELIEF SOUGHT

141.  WHEREFORE, R.B. prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for R.B. against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which R.B. may, in law or in equity, show herself to be justly entitled.

Respectfully submitted,

**PROVOST ✴ UMPHREY LAW FIRM, L.L.P.**

/s/Bryan O. Blevins, Jr.
BRYAN O. BLEVINS, JR.
Texas Bar No. 02487300
MATTHEW MATHENY
Texas Bar No. 24039040
COLIN D. MOORE
Texas Bar No. 24041513
CLAIRE BROWN

45

Texas Bar No. 24108010
350 Pine Street, Ste. 1100
Beaumont, TX 77701
(409) 835-6000 Telephone
bblevins@pulf.com
mmatheny@pulf.com
cmoore@pulf.com
cbrown@pulf.com

**ATTORNEYS FOR PLAINTIFF**