**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**LUFKIN DIVISION**

| | |
|---|---|
| JANE DOE (R.B.), AN INDIVIDUAL<br>*Plaintiff*<br><br>v.<br><br>CHOICE HOTELS INTERNATIONAL SERVICES CORP., CHOICE HOTELS INTERNATIONAL, INC., AND S & S HOTELS, INC.<br><br>*Defendants* | CIVIL ACTION NO: 9:26-cv-00019 |

### RESPONSE TO MOTION TO DISMISS OF CHOICE DEFENDANTS
### (ORAL ARGUMENT REQUESTED)

**TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ..................................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 3

ARGUMENT ............................................................................................................................. 6

    I.    R.B. States a Valid TVPRA Beneficiary Claim Directly Against Choice.......................... 6

        A.    Choice misstates the standard for beneficiary liability. ..................................................... 6

        B.    R.B. plausibly alleges a knowing benefit........................................................................... 9

        C.    Choice participated in a venture that was engaged in TVPRA violations. ..................... 9

        D.    R.B. plausibly alleges mens rea. ..................................................................................... 15

    II.    R.B. Plead a Vicarious Liability Claim Against Choice.................................................... 21

    III.    Section 2255 Authorizes the Claims that R.B. Brings against Choice. ......................... 23

        A.    Section 2255 applies to claims against beneficiaries of trafficking............................. 24

        B.    Section 2255 does not displace ordinary agency principles. ....................................... 29

    IV.    Venue is Proper................................................................................................................. 29

CONCLUSION......................................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171, 180–81 (E.D. Pa. 2020)..................................... 6

*A.B. v. Wyndham Hotel & Resorts, Inc.*, 2025 LX 290252 (M.D. Pa. July 11, 2025).................... 6

*A.D. v. Wyndham Hotels & Resorts, Inc.,* 2020 U.S. Dist. LEXIS 250670, at *13 (E.D. Va. Sep. 21, 2020) (*A.D. II*)............................................................................................................. 22

*A.D. v. Wyndham Hotels & Resorts, Inc.,* 2020 U.S. Dist. LEXIS 250759, at *7, 11 (E.D. Va. July 22, 2020) ............................................................................................................. 13, 14

*A.G. v. Northbrook Indus., Inc.*, ___ F.4th ___, 2026 WL 864178 (11th Cir. 2026)…………passim

*A.M. v. Wyndham Hotels & Resorts, Inc.*, 728 F. Supp. 3d 787, 795 (S.D. Ohio 2024) .............. 25

*A.M. v. Wyndham Hotels & Resorts, Inc.*, 728 F. Supp. 3d 787, 795, n.3 (S.D. Ohio 2024) ....... 29

*AT&T Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1430-31 (3d Cir. 1994)......... 29

*B.N.T. v. G6 Hospitality, LLC, et. al,* 9:23-cv-00198-MJT, ECF No. 67 (E.D. Texas, Sept 30, 2024) ................................................................................................................................. 2

*Bates v. Seuqel Youth & Family Services*, LLC, 2025 WL 2917756, at *5 (N.D. Ala. Oct. 14, 2025) ............................................................................................................................... 24

*Boim v. Quranic Literacy Inst. & Holy Land Found. For Relief And Dev.*, 291 F.3d 1000, 1019 (7th Cir. 2002)............................................................................................................ 27, 28

*Cassone v. Austin Chron. Corp.*, 2024 U.S. Dist. LEXIS 82778, at *25-26 (W.D. Tex. May 7, 2024) .................................................................................................................. 6, 8, 9, 13

*Central Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164 (1994) .......................... 27, 28, 29

*D.D.J. v. G6 Hospitality, LLC, et. al,* 1:23-cv-00269-MJT, ECF No. 96 (E.D. Texas, Oct. 1, 2024) ................................................................................................................................. 2

*Doe (A.M.G.) v. Wyndham Hotels & Resorts, Inc.*, 2025 LX 289536 (E.D. Va. Mar. 6, 2025) ... 6, 11, 15

*Doe (A.R.J.) v. Wyndham Hotels & Resorts*, 2024 U.S. Dist. LEXIS 156829 (W.D. Tex. Aug. 30, 2024) ............................................................................................................................. 2, 9

*Doe (H.E.W). v. Radisson Hosp., Inc.*, 2025 LX 263843 (W.D. Tex. Jan. 21, 2025) .................... 2

*Doe (J.R.F). v. G6 Hosp. LLC*, No. 9:24-cv-00249-MJT, Doc. 36 (E.D. Tex. Jan. 26, 2026)....... 1

*Doe (J.T.A.) v. Wyndham Hotels & Resorts, Inc.*, 2025 LX 426218 (D.N.J. Sep. 24, 2025) ......... 6

*Doe (K.R.D.) v. Hilton Worldwide Holdings Inc.,* 2025 LX 369630 (N.D. Cal. Sep. 4, 2025).. 6, 7

*Doe (K.R.D.) v. Wyndham Hotels & Resorts, Inc.*, at *1 (D.N.J. Apr. 21, 2025)....................... 6, 9

*Doe (L.M.) v. 42 Hotel Raleigh, LLC,* 2024 U.S. Dist. LEXIS 165863, at *14 (E.D.N.C. Sep. 16, 2024) ........................................................................................................................... passim

*Doe (M.S.H.) v. Wyndham Hotels & Resorts, Inc.*, 2025 LX 79118 (C.D. Cal. Mar. 5, 2025)6, 11, 15

Doe (T.D.B.) v. G6 Hospitality, 9:23-cv-00174-MJT, ECF No. 55 at pp. 23–24 (E.D. Tex. Sept. 30, 2024) ............................................................................................................................ 16

*Doe (T.W.) v. JRD P'ship,* 2025 LX 219100, at *20 (M.D. Tenn. Apr. 10, 2025). ...................... 18

*Doe A.L.G. v. Wyndham Hotel & Resorts, Inc.*, 2024 U.S. Dist. LEXIS 212384 (W.D. Tex. Nov. 21, 2024) ................................................................................................................... 2, 6, 16

*Doe C.J. v. Cotugno,* 2024 U.S. Dist. LEXIS 188925, at *5 (D.N.J. 2024)................................... 7

*Doe C.M.S. v. Wyndham Hotels & Resorts, Inc.*, 2025 LX 149587 (S.D. Cal. Mar. 13, 2025) .... 6, 11, 15

*Doe K.E.C. v. G6 Hosp., LLC,* 750 F. Supp. 3d 719, 725 (E.D. Tex. 2024) ......................... passim
*Doe K.R. v. Choice Hotels,* 2024 U.S. Dist. LEXIS 104200, at \*13 (M.D. Fla. June 12, 2024).... 6
*Doe M.S.H. v. Marriott Int'l, Inc.*, 2025 LX 114261, at \*5 (C.D. Cal. June 24, 2025) ................ 11
*Doe S.R.C. v. G6 Hosp. LLC*, 2024 LX 238807, at \*3 (E.D. Tex. Sep. 25, 2024) ......................... 1
*Doe T.D.B. v. G6 Hosp., LLC*, 2024 LX 293889 (E.D. Tex. Sep. 26, 2024)................................. 1
*Doe v. Mindgeek USA Inc.*, 558 F. Supp. 3d 828, 838 (C.D. Cal. 2021)..................................... 15
*Doe v. Scottsdale Inns LLC*, 2024 U.S. Dist. LEXIS 199680 (D. Ariz. Nov. 4, 2024) (*D.H. II*)... 6
*E.B. v. Howard Johnson by Wyndham Newark Airport,* 2023 U.S. Dist. LEXIS 231401(D.N.J. Dec. 29, 2023)................................................................................................................ 7
*G.G. v. Salesforce.Com, Inc.*, 76 F.4th 544, 559 (7th Cir. 2023) ................................................ 8, 9
*J.M. v. Choice Hotels Int'l, Inc.*, 2023 U.S. Dist. LEXIS 84861 (E.D. Cal. May 12, 2023) .......... 6
*Jane Doe No. 8 v. Royal Caribbean Cruises, Ltd.*, 860 F. Supp. 2d 1337, 1340 (S.D. Fla. 2012) ................................................................................................................................. 24, 26
*K.A. v. 26th St. Hosp., LLP*, 2024 U.S. Dist. LEXIS 87132, at \*15 (D.N.D. Apr. 15, 2024) ...... 16
*K.B. v. Inter-Cont'l Hotels Corp.*, 2020 WL 8674188, at \*7 (D.N.H. Sept. 28, 2020) ................ 22
*K.F. v. Choice Hotels Int'l, Inc.*, 2024 WL 1256052, at \*3 (S.D. Ohio Mar. 25, 2024) .............. 24
*M.A. v. Wyndham Hotels & Resorts, Inc.*, 2025 LX 464442, at \*6, n.7 (S.D. Ohio Sep. 22, 2025) ............................................................................................................. 6, 7, 13, 18
*M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 964 (S.D. Ohio 2019).... 6, 11, 13
*Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 708 (7th Cir. 2008)......................... 29
*Meyer v. Holley*, 537 U.S. 280, 285 (2003) ................................................................................. 29
*S. Y. v. Wyndham Hotels & Resorts, Inc.*, 519 F. Supp. 3d 1069, 1082 (M.D. Fla. 2021) ........... 15
*S.Y. v. Naples Hotel Co.,* 476 F. Supp. 3d 1251, 1258 (M.D. Fla. 2020) .................................... 22
*S.Y. v. Wyndham Hotels & Resorts, Inc.*, 519 F. Supp. 3d 1069 (M.D. Fla. 2021) ........................ 7
*United States v. Burke*, 504 U.S. 229, 234 & n.6, (1992)............................................................ 28
*Wood v. Sec. Credit Servs.*, LLC, 126 F.4th 1303, 1312 (7th Cir. 2025) ..................................... 16

**Statutes**
18 U.S.C. § 1591.......................................................................................................................... 23
18 U.S.C. § 2255 .................................................................................................................... passim
18 U.S.C. 1595 ....................................................................................................................... passim

**Treatises**
Restatement (Second) of Torts, § 12............................................................................................ 16

R.B. files this Response in Opposition to the Motion to Dismiss filed by Choice Hotels International Services Corp. and Choice Hotels International, Inc. (collectively "Choice"). R.B. requests oral argument to fully present her position in this matter.

### **INTRODUCTION**

Section 1595(a) of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1581, *et seq.,* establishes beneficiary liability, providing trafficking victims a civil remedy against those who, while not themselves criminally liable, know or should know they are benefiting from facilitating trafficking. See 18 U.S.C. § 1595(a). Separately, the Child Abuse Victims' Rights Act ("CAVRA") authorizes an additional civil remedy for individuals trafficked as minors, with enhanced protections that include nationwide service of process, elimination of the statute of limitations, and statutory minimum damages. 18 U.S.C. § 2255.

R.B. was a minor when her trafficker began selling her for sex at the College Park Comfort Inn, a hotel that S&S Hotels, Inc. ("Franchisee") owned and, together with Choice, operated through the Comfort Inn franchising system. R.B.'s trafficker returned to the College Park Comfort Inn repeatedly and kept R.B. there for extended stretches because he could operate without interference from hotel staff and under conditions that minimized his risk of detection. He and other traffickers could do so because Choice and Franchisee continued providing rooms, hotel services, and a favorable environment for the trafficking of R.B. and many other victims, even in the face of obvious and recurring red flags. Choice thus knew or should have known that it was benefiting from participation in a venture that was facilitating trafficking. R.B. accordingly brings this action under the TVPRA and § 2255.

1

Choice's motion to dismiss fails at every turn. It rests on an artificially narrow reading of § 1595(a) that conflicts with prior decisions of this Court and other district courts in Texas,[1] and that would effectively collapse the distinction between criminal and civil beneficiary liability. Choice's narrow view of beneficiary liability would strip the statute's "should have known" standard of all meaning and insulate hotel franchisors from accountability regardless of how deeply they are embedded in the operational structures of hotels that facilitate trafficking. Choice's vicarious liability arguments would likewise categorically immunize franchisors from agency-based liability by recharacterizing detailed allegations of operational control as mere "brand-standard oversight," an argument this Court has already rejected.[2]

Strikingly, Choice advances these arguments without meaningful engagement with the decisions from this Court that control this case.[3] Choice cites *K.E.C.* exactly once, and only for the narrow proposition that a plaintiff who merely alleges a failure to intervene does not state a participation claim. But Choice ignores that *K.E.C.* found allegations materially like those presented here went well beyond a failure to prevent trafficking and stated beneficiary and vicarious liability claims under the TVPRA. Choice asks the Court to abandon its prior reasoning in favor of a minority approach, drawn primarily from out-of-circuit authority, that conflicts with the statute's text and remedial purpose.

---

[1] *See, e.g., Doe K.E.C. v. G6 Hosp., LLC,* 750 F. Supp. 3d 719, 725 (E.D. Tex. 2024); *Doe T.D.B. v. G6 Hosp., LLC*, 2024 LX 293889 (E.D. Tex. Sep. 26, 2024); *Doe S.R.C. v. G6 Hosp. LLC*, 2024 LX 238807, at *3 (E.D. Tex. Sep. 25, 2024); *Doe (J.R.F.) v. G6 Hosp. LLC*, No. 9:24-cv-00249-MJT, Doc. 36 (E.D. Tex. Jan. 26, 2026); *B.N.T. v. G6 Hospitality, LLC, et. al,* 9:23-cv-00198-MJT, ECF No. 67 (E.D. Texas, Sept 30, 2024); *D.D.J. v. G6 Hospitality, LLC, et. al,* 1:23-cv-00269-MJT, ECF No. 96 (E.D. Texas, Oct. 1, 2024)*; Doe (A.R.J.) v. Wyndham Hotels & Resorts*, 2024 U.S. Dist. LEXIS 156829 (W.D. Tex. Aug. 30, 2024); *Doe (H.E.W.) v. Radisson Hosp., Inc.*, 2025 LX 263843 (W.D. Tex. Jan. 21, 2025); *Doe A.L.G. v. Wyndham Hotel & Resorts, Inc.*, 2024 U.S. Dist. LEXIS 212384 (W.D. Tex. Nov. 21, 2024).

[2] *See, e.g., Doe S.R.C.*, 2024 U.S. Dist. LEXIS 253404, at *35-38.

[3] *See supra* at note 1.

Choice's argument that § 2255 is limited to defendants who directly violated an enumerated criminal predicate fares no better. It ignores the statute's plain text, its civil remedial purpose, the settled principle that federal tort statutes incorporate ordinary agency rules, and the growing body of case law rejecting that narrow construction. Finally, Choice's venue argument fails because it rests on the flawed premise that R.B.'s § 2255 claim fails.

## STATEMENT OF FACTS

R.B. is a survivor of child sex trafficking. (ECF No. 1 ¶ 1). In 2011, as a teenager who had run away from foster care, she met her trafficker, an older man and gang member who raped her, forced her into commercial sex, and kept all the money she earned. (*Id.* ¶¶ 17, 19-20). He controlled R.B. through violence, threats against her family, branding, emotional manipulation, and constant surveillance, and when she tried to leave, he had his associates beat her. (*Id.* ¶¶ 20-23). R.B. had no permanent residence during her trafficking; her trafficker moved her between his preferred hotels in Fulton County, Georgia. (*Id.* ¶ 24). R.B. remained under his continuous control until late 2013, when an older woman promised her a better life in Florida but instead exploited R.B. for commercial sex until she became pregnant. (*Id.* ¶¶ 28-29).

One of the hotels where R.B. was trafficked was the College Park Comfort Inn; she was trafficked there on 30 or more days between approximately 2011 and late 2013. (*Id.* ¶ 26). Franchisee provided on-site operations at the College Park Comfort Inn, while Choice directly participated in and exercised control over core aspects of operations, including room rental and practices central to identifying and responding to sex trafficking. (*Id.* ¶¶ 2, 11).

Before and during R.B.'s trafficking, the problem of sex trafficking in hotels was well known, and government bodies, law enforcement agencies, non-profits, and trade associations had devoted substantial effort to educating the hotel industry, including Choice and Franchisee, on best practices for identifying and responding to trafficking. (*Id.* ¶¶ 30, 32). These efforts produced

3

widely recognized "red flags," which are based on the recognition that sex trafficking follows well-established patterns and can be readily detected by appropriately trained hotel staff. (*Id.* ¶¶ 33-36). Both Choice and Franchisee were on notice of these red flags and of recognized practices for detecting and avoiding the facilitation of trafficking. (*Id.* ¶¶ 38-44, 47-48).

Choice also knew, well before R.B.'s trafficking, that sex trafficking was ongoing and widespread specifically at Choice-branded properties, including Comfort Inn hotels. (*Id.* ¶¶ 51-58). News articles from before and during R.B.'s trafficking period documented a steady pattern of trafficking arrests and prosecutions at Comfort Inn and other Choice properties. (*Id.* ¶¶ 53-54). Online reviews of Choice-branded properties during the same period similarly documented the open presence of prostitution, commercial sex activity, and related criminal conduct at Choice locations nationwide. (*Id.* ¶¶ 56-57). Despite this mounting evidence that sex trafficking was widespread and ongoing in its hotels, Choice did not change course; it continued to operate in ways that it knew or should have known would facilitate ongoing trafficking and continued to benefit from the use of its hotels as trafficking venues. (*Id.* ¶¶ 59-61).

Trafficking, commercial sex, and associated criminal activity were prevalent at the College Park Comfort Inn. (*Id.* ¶¶ 62-63, 66). R.B. was aware of other victims being trafficked at the hotel, both by her trafficker and by other men, and there were obvious signs of this activity matching industry-recognized red flags. (*Id.* ¶¶ 67-68). R.B.'s own trafficking at the College Park Comfort Inn was accompanied by numerous observable indicators. (*Id.* ¶ 69).[4]

---

[4] Staff and management had a reasonable opportunity to observe R.B., who was clearly a minor, in the company of an older, unrelated man. (*Id.* ¶¶ 27, 69). Among other red flags, rooms were frequently paid for in cash one day at a time, her trafficker often booked multiple rooms, there was a constant flow of unregistered men in and out of her room at all hours, and her trafficker was seen going to and from her room repeatedly throughout the day to collect money. (*Id.* ¶ 69). Housekeeping staff would have observed sex and drug paraphernalia, frequent requests for extra towels, constant use of "do not disturb" signs, and obvious signs of drug use. (*Id.*). R.B. was visibly bruised from beatings, often appeared intoxicated despite her youth, and loud altercations were audible from the rooms. (*Id.*). Multiple other girls, at least three of whom were also minors, were being trafficked at the hotel simultaneously, collectively seeing up to

4

Choice supervised the College Park Comfort Inn through multiple mechanisms, including the Choice ADVANTAGE system (through which it collected and maintained direct access to guest and operational data), mandatory reporting obligations imposed on Franchisee, monitoring of online reviews and guest complaints, field-based associates engaged on operational issues, and its right to conduct regular and unannounced inspections. (*Id.* ¶¶ 74, 87, 108). Choice also directly controlled the operational areas most relevant to trafficking: the reservation, check-in, and payment processes (through the central reservation system and its detailed policies on payment methods, guest identification, occupancy, and permissible check-in questions) (*Id.* ¶ 88), and staff training and the policies and protocols for detecting and responding to trafficking (*Id.* ¶ 87). Despite this oversight and control, Choice operated the hotel in ways that facilitated trafficking, including through identification and payment policies that allowed traffickers to secure rooms without traceable information, inadequate training and response protocols, and continued Wi-Fi access that traffickers used to advertise their activity. (*Id.* ¶ 92). With reasonable diligence, Choice would have detected and deterred the trafficking at this hotel, including R.B.'s. (*Id.* ¶¶ 77-79).

Choice received revenue from the College Park Comfort Inn's business relationship with the traffickers who rented rooms there and from its role in the hotel-operating venture with Franchisee, which facilitated the trafficking of victims, including R.B. Choice's fees were primarily based on gross room rentals and increased with each room rented to a trafficker; Choice also benefited from the increased occupancy rate that regular trafficker use produced, which helped Choice obtain financing and market franchising opportunities to potential franchisees. (*Id.* ¶ 96). Through the conduct described above, Choice and Franchisee knowingly benefited from

---

fifty buyers per day. (*Id.*). Hotel staff employed by Franchisee observed or were otherwise made aware of these obvious signs of trafficking while performing their ordinary job functions. (*Id.* ¶¶ 70, 80).

participating in a venture with the traffickers operating at the College Park Comfort Inn, including R.B.'s trafficker, through the ongoing, mutually beneficial business relationship that developed between those traffickers and the hotel. (*Id.* ¶¶ 97-100). Choice and Franchisee also participated in a hotel-operating venture with one another, jointly operating the College Park Comfort Inn in ways that facilitated trafficking. (*Id.* ¶¶ 101-104). And Choice exercised sufficient control over operations that Franchisee and hotel staff acted as its agents. (*Id.* ¶¶ 105-108).

## ARGUMENT

### I.    R.B. States a Valid TVPRA Beneficiary Claim Directly Against Choice.

R.B. plausibly pleads a claim directly against Choice for beneficiary liability under § 1595(a) of the TVPRA, and the Court should deny Choice's request to dismiss that claim.

### A.    Choice misstates the standard for beneficiary liability.

Beneficiary liability reflects Congress's deliberate decision to broaden the scope of civil remedies available to trafficking survivors.[5] It imposes liability against those who, while not criminal perpetrators, financially benefit from unknowingly (but *negligently*) facilitating trafficking.[6] Beneficiary liability "targets the financial motivations and the infrastructure that allows trafficking organizations to thrive."[7] Under these principles, a plaintiff can state a beneficiary claim by alleging that a defendant negligently facilitated sex trafficking by renting hotel rooms to traffickers despite obvious signs of their trafficking activity.[8] Thus, this Court and other courts in the Fifth Circuit and around the country have repeatedly allowed beneficiary claims to proceed based on similar allegations.[9]

---

[5] *M.A. v. Wyndham Hotels & Resorts, Inc.*, 2025 LX 464442, at *6, n.7 (S.D. Ohio Sep. 22, 2025) (recounting legislative history) (*M.A. II*) (denying summary-judgment motion).

[6] *Cassone v. Austin Chron. Corp.*, 2024 U.S. Dist. LEXIS 82778, at *25-26 (W.D. Tex. May 7, 2024); *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 964 (S.D. Ohio 2019); *see also A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171, 180–81 (E.D. Pa. 2020); *Doe (L.M.) v. 42 Hotel Raleigh, LLC,* 2024 U.S. Dist. LEXIS 165863, at *14 (E.D.N.C. Sep. 16, 2024) (*L.M. III*).

[7] *M.A. II*, 2025 LX 464442, at *6.

[8] *L.M. III*, 2024 U.S. Dist. LEXIS 165863, at *14.

[9] *See, e.g., Doe K.E.C.*, 750 F. Supp. 3d 719; *Doe (A.R.J.)*, 2024 U.S. Dist. LEXIS 156829; *Doe (H.E.W.) v*, 2025 U.S. Dist. LEXIS 19682; *Doe A.L.G.*, 2024 U.S. Dist. LEXIS 212384; *Doe C.M.S. v. Wyndham Hotels & Resorts,*

Choice's motion rests on a narrow, atextual view of beneficiary liability that runs afoul of these principles. Choice ignores two fundamental principles of beneficiary liability: that (1) given the "should have known" *mens rea* standard, the "participation in a venture" element of a beneficiary claim cannot be interpreted in a way that would require that a beneficiary had actual knowledge of sex trafficking; and (2) the "should have known" standard implicates negligence principles, such that a beneficiary can be held liable based on failure to take reasonable steps in response to a known problem of trafficking in its operations.[10] This Court has rejected a narrow construction requiring an overt act or unlawful purpose. *Doe K.E.C.*, 750 F. Supp. 3d at 731, 735.

Choice's justification for its narrow interpretation of beneficiary liability relies on the Eleventh Circuit's unpublished decision in *K.H. v. Riti, Inc.*, 2024 WL 505063 (11th Cir. Feb. 9, 2024). But whatever foundation *Riti* previously provided, that foundation has now crumbled. Even the Eleventh Circuit, while continuing to adopt an unduly narrow reading of § 1595(a), has rejected *Riti* as the governing framework. In *A.G. v. Northbrook Indus., Inc.*, ___ F.4th ___, 2026 WL 864178 (11th Cir. 2026), a published, precedential decision, the Eleventh Circuit addressed both the participation in a venture and *mens rea* elements of a § 1595(a) beneficiary claim. *A.G.* did not cite, discuss, or apply *Riti*. Instead, the court vacated summary judgment decisions that had been premised on applying *Riti*'s principles.[11] The Eleventh Circuit held that each plaintiff had

---

*Inc.*, 2025 LX 149587 (S.D. Cal. Mar. 13, 2025); *Doe (J.T.A.) v. Wyndham Hotels & Resorts, Inc.*, 2025 LX 426218 (D.N.J. Sep. 24, 2025); *Doe (K.R.D.) v. Hilton Worldwide Holdings Inc.*, 2025 LX 369630 (N.D. Cal. Sep. 4, 2025); *A.B. v. Wyndham Hotel & Resorts, Inc.*, 2025 LX 290252 (M.D. Pa. July 11, 2025); *Doe (K.R.D.) v. Wyndham Hotels & Resorts, Inc.*, at *1 (D.N.J. Apr. 21, 2025); *Doe (A.M.G.) v. Wyndham Hotels & Resorts, Inc.*, 2025 LX 289536 (E.D. Va. Mar. 6, 2025); *Doe (M.S.H.) v. Wyndham Hotels & Resorts, Inc.*, 2025 LX 79118 (C.D. Cal. Mar. 5, 2025); *Doe v. Scottsdale Inns LLC*, 2024 U.S. Dist. LEXIS 199680 (D. Ariz. Nov. 4, 2024) (*D.H. II*); *Doe K.R. v. Choice Hotels*, 2024 U.S. Dist. LEXIS 104200, at *13 (M.D. Fla. June 12, 2024) (*K.R. I*); *J.M. v. Choice Hotels Int'l, Inc.*, 2023 U.S. Dist. LEXIS 84861 (E.D. Cal. May 12, 2023) (*J.M. II*); *S.Y. v. Wyndham Hotels & Resorts, Inc.*, 519 F. Supp. 3d 1069 (M.D. Fla. 2021); *E.B. v. Howard Johnson by Wyndham Newark Airport,* 2023 U.S. Dist. LEXIS 231401(D.N.J. Dec. 29, 2023); *Doe C.J. v. Cotugno,* 2024 U.S. Dist. LEXIS 188925, at *5 (D.N.J. 2024).

[10] *See, e.g., M.A. II*, 2025 LX 464442, at *41, 51; *Doe (K.R.D.)*, 2025 LX 149015, at *14-*15.

[11] *See G.W. v. Northbrook Indus., Inc.*, 739 F. Supp. 3d 1243, 1248 (N.D. Ga. 2024); *C.B. v. Naseeb Invs., Inc.*, 748 F. Supp. 3d 1338, 1341 (N.D. Ga. 2024).

presented sufficient evidence to proceed to trial on her beneficiary claim. *A.G.*, 2026 WL 864178, at *29, *37. While *A.G.* continues to require "something more" than an ordinary arm's-length transaction, the court made clear that the bar is not high: evidence of personalized support that facilitates trafficking can suffice, and a hotel's application of trafficking-facilitating practices to a plaintiff or her trafficker can support a finding of participation. *Id.* at *22-23, *30-31. *A.G.* also reaffirmed that § 1595(a) imposes a negligence-based standard and that the knowledge inquiry turns on knowledge at the venture level rather than knowledge of a specific victim. *Id.* at *24-26, *32. To the extent *Riti* ever supplied the governing Eleventh Circuit framework, *A.G.* has superseded it with binding, published authority.

Relatedly, Choice argues at length that the term facilitation appears nowhere in the TVPRA and that R.B.'s complaint thus misstates the legal standard. This argument is flawed. In fact, the definition of "participation in a venture" for criminal venture liability uses this term. 18 U.S.C. § 1591(e)(4) ("The term 'participation in a venture' means knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)"). Courts, including this one, have correctly declined to import that definition wholesale into § 1595(a), because the "knowingly" modifier is incompatible with the civil statute's "should have known" standard and would render that language largely superfluous. However, this definition for criminal liability certainly sets a ceiling on what can be required for a beneficiary's participation. *G.G. v. Salesforce.Com, Inc.*, 76 F.4th 544, 559 (7th Cir. 2023); *see also K.E.C.*, 750 F. Supp. 3d at 730, 735 (finding *G.G.* definition "instructive"). Thus, a beneficiary's unknowing (but negligent) facilitation of trafficking suffices.[12] Under a proper interpretation of § 1595(a), R.B. properly pleads a beneficiary claim against Choice.

---

[12] *Cassone*, 2024 U.S. Dist. LEXIS 82778, at *25-26; *L.M. III*, 2024 U.S. Dist. LEXIS 165863, at *14; *Doe (K.R.D.) v. Hilton Worldwide Holdings Inc.*, 798 F. Supp. 3d 1082, 1094 (N.D. Cal. 2025) ("Although this definition does not apply directly to section 1595, it makes little sense to conclude, absent any indication in the statutory text, that when

### B. R.B. plausibly alleges a knowing benefit.

The "knowingly benefited" element imposes a modest burden; all that is required is that the defendant was aware it was receiving some financial or other benefit from its participation in the venture. *Doe K.E.C.*, 750 F. Supp. 3d at 731, 733; *G.G.*, 76 F.4th at 565. And "the rental of a room (or [the defendant's] receipt of royalties for that rental) constitutes a financial benefit from a relationship with the trafficker sufficient to meet this element." *Doe (A.R.J.)*, 2024 U.S. Dist. LEXIS 156829, at *8. Choice received revenue from traffickers' rental of rooms. (ECF No. 1 ¶¶ 90, 96). This suffices. Choice does not appear to dispute this at the 12(b)(6) stage.

### C. Choice participated in a venture that was engaged in TVPRA violations.

Choice's core error is ignoring that the "participation in a venture" element must be read in harmony with § 1595(a)'s "should have known" standard.[13] A venture under § 1595(a) need not be criminal; a commercial venture suffices.[14] And participation does not require intent to join a trafficking scheme; it is enough to assist or facilitate the venture, even if this is done unknowingly.[15]

The Complaint pleads how the College Park Comfort Inn provided a favorable venue for and enabled trafficking. The hotel accepted cash payments one day at a time, did not require identification from unregistered visitors, and allowed a steady flow of unregistered men to enter and exit R.B.'s rooms at unusual hours. (ECF No. 1 ¶¶ 69, 92, 100). It maintained training and response protocols so inadequate that staff repeatedly observed obvious red flags associated with R.B.'s trafficking and that of other victims, yet continued renting rooms and providing services to

---

Congress amended the TVPRA to expand liability it intended for one of the terms it used in doing so to be defined far more narrowly than it was already defined elsewhere in the statute.")

[13] *See, e.g., Doe (K.E.C.)*, 750 F. Supp. 3d at 730; *Doe (A.R.J.)*, 2024 U.S. Dist. LEXIS 156829, at *8, *14; *Doe (K.R.D.)*, 2025 LX 369630, at *11.

[14] *Doe K.E.C.,* 750 F. Supp. 3d at 734.

[15] *G.G.*, 76 F.4th at 559 ("Participating does not therefore require more than assisting, supporting, or facilitating a venture that violates Section 1591.") (cleaned up); *L.M. III*, 2024 U.S. Dist. LEXIS 165863, at *14; *Cassone*, 2024 U.S. Dist. LEXIS 82778, at *25.

the traffickers operating there. (*Id.* ¶¶ 69-70, 80, 84, 92). It provided traffickers Wi-Fi access used to advertise trafficking activity and housekeeping services that cleaned up after it. (*Id.* ¶¶ 69, 92). And it created an implicit understanding with traffickers that they could operate at the hotel without needing to conceal their activity. (*Id.* ¶¶ 84, 93, 98, 100). These were not isolated lapses but features of how the hotel was run. Together, they gave R.B.'s trafficker both a physical venue and the cover of a legitimate business through which he could exploit her and other victims while minimizing the risk of detection or traceability. (*Id.* ¶¶ 93, 100).

Moreover, the Complaint alleges how Choice's involvement in hotel operations contributed to this facilitation of trafficking. Choice played a central role in the room-rental process, controlling the guest reservation, check-in, and payment processes through its control and operation of the central reservation system ("CRS") and through its adoption of detailed, step-by-step policies dictating payment methods, guest identification requirements, the number of guests per room, and what questions staff could ask at check-in. (*Id.* ¶ 88). Choice directly took reservations and accepted payments through the CRS without the involvement or approval of Franchisee, and it required the use of its Choice ADVANTAGE property management system for virtually all aspects of hotel operations related to room rentals. (*Id.*). Choice also retained control over, and was directly involved in, the very operational aspects that made the hotel trafficking-friendly, including training of staff on the detection of and response to trafficking, the policies and protocols governing that response, the systems for reporting suspected criminal activity, the systems providing and monitoring guest Wi-Fi, and the procedures for monitoring housekeeping. (*Id.* ¶ 87). Choice used this retained control and direct involvement to operate the hotel in ways that facilitated trafficking: adopting and enforcing identification and payment policies that allowed traffickers to secure rooms without providing traceable information, adopting training and protocols so inadequate that

obvious signs of trafficking went unaddressed, and providing traffickers continued access to the Wi-Fi systems they used to market their activity. (*Id.* ¶ 92).

These allegations support an inference of Choice's participation in two overlapping ventures. **First**, Choice and Franchisee participated in an ongoing business relationship with the traffickers operating at the College Park Comfort Inn, including R.B.'s trafficker. (*Id.* ¶¶ 97-100). The hotel repeatedly rented rooms to traffickers despite actual or constructive knowledge of trafficking, and operated in ways that produced an understanding by traffickers that the College Park Comfort Inn was a low-risk place to operate. (*Id.* ¶¶ 84, 98). The venue and related services enabled R.B.'s trafficker to sell her to multiple buyers each day and to traffic multiple victims simultaneously. He returned repeatedly, keeping R.B. there on 30 or more days, because he could operate without meaningful interference. (*Id.* ¶¶ 26, 98,100). The hotel gave R.B.'s trafficker both a physical venue and the cover of a legitimate business through which he could exploit her and other victims while minimizing the risk of detection or traceability. (*Id.* ¶¶ 93, 100). One way to establish a defendant's participation in a venture is to show its role in a continuous business relationship with traffickers that facilitates their trafficking activity.[16] Choice participated through its central role in room rentals and its control over and direct involvement in the operational aspects that made the hotel the kind of low-risk, anonymous environment traffickers sought out. (*Id.* ¶¶ 87-88, 92, 98). Numerous courts hold that comparable allegations adequately plead a hotel franchisor's participation in a commercial venture that supports beneficiary liability under 18 U.S.C. § 1595(a).[17]

---

[16] *See, e.g.*, *Doe K.E.C.*, 750 F. Supp. 3d at 734-735; *Doe (A.R.J.)*, 2024 U.S. Dist. LEXIS 156829, at *22.

[17] *See, e.g.*, *Doe (A.R.J.)*, 2024 U.S. Dist. LEXIS 156829, at *8; *M.A.*, 425 F. Supp. 3d at 971; *Doe M.S.H. v. Marriott Int'l, Inc.*, 2025 LX 114261, at *5 (C.D. Cal. June 24, 2025) (rental of rooms facilitates sex trafficking and constitutes participation); *Doe C.M.S.*, 2025 LX 149587, at *23; *Doe (A.M.G.)*, 2025 LX 289536, at *13; *Doe (M.S.H.)*, 2025 LX 79118, at *13.

11

**Second**, Choice and Franchisee participated in a commercial hotel-operating venture, through which they jointly operated the College Park Comfort Inn with the shared objective of maximizing gross room revenue and occupancy. (*Id.* ¶¶ 101-103). That venture was engaged in violations of the TVPRA through trafficking that occurred on site, where victims, including R.B., were harbored, maintained, provided, and exploited, which Choice facilitated through operating the hotel in ways that made it easier for traffickers to operate. (*Id.* ¶ 104); *Doe (K.R.D.) v. Hilton Worldwide Holdings Inc.*, 798 F. Supp. 3d 1082, 1094 (N.D. Cal. 2025) ("Accordingly, for the purposes of section 1595, the Court will construe participation in a venture that 'engaged in an act in violation of this chapter' to mean not that the venture itself must have committed a violation of subsection (a)(1), but that the venture must have 'assist[ed], support[ed], or facilitate[d]' a violation of that subsection."); *Cf. Doe (A.S.F.) v. Wyndham Hotels & Resorts, Inc.,* 2026 LX 170335, at *12 (D.N.J. Mar. 30, 2026) (holding that as "long as a TVPRA violation **is within the scope of the venture**, a defendant can 'participate' commercially and still be held liable") (emphasis added); *S.G. v. Coastal Hosp. Assocs., LLC.*, 2025 LX 556576, at *9 (E.D. Va. Nov. 20, 2025) (requirement that commercial venture engaged in violation of TVPRA satisfied by allegations that plaintiff's traffickers used hotel to traffic her); *cf. also G.G.*, 76 F.4th at 559 (recognizing that "providing hotel rooms" amounts to "direct involvement in sex trafficking itself"). Choice participated through the extensive roles described above. (*Id.* ¶ 103). This Court has previously recognized that a venture of this type is sufficient to plead a hotel franchisor's participation in a venture as a beneficiary under the TVPRA, finding "a plaintiff sufficiently alleges the 'participation in a venture element' when she pleads facts that link her trafficking to the franchisors by demonstrating that the franchisors facilitated the trafficking through repeated renting of rooms and substantial oversight over the franchisees' hotel operations." *Doe K.E.C.*,

12

750 F. Supp. 3d at 735. Other courts, too, have recognized that a commercial undertaking operating a hotel can be a "venture" under § 1595(a).[18]

Choice's contrary arguments lack merit. It argues that its role in these ventures cannot support beneficiary liability because providing ordinary commercial services that facilitate trafficking, even with the requisite "should have known" *mens rea*, is insufficient as a matter of law. But nothing in § 1595(a) supports a carve-out immunizing those who provide commercial services that facilitate trafficking. Under § 1595(a), the relevant inquiry is whether the defendant's actions facilitated trafficking, even if unknowingly (but negligently).[19] Providing a venue where traffickers operate plainly does so:

> In the sex trafficking industry, that infrastructure begins and ends with physical spaces. Sex trafficking ventures cannot operate without access to physical spaces. So, it follows that providing traffickers with a room is providing them with an essential place of business. That is 'participation.' This is not a radical take. Without the room, there would be no trafficking.

*M.A. II*, 2025 LX 464442, at \*6-7; *see also A.D. v. Wyndham Hotels & Resorts, Inc.,* 2020 U.S. Dist. LEXIS 250759, at \*7, 11 (E.D. Va. July 22, 2020) (*A.D. I*) ("Although a hotel does not directly or knowingly participate in sex trafficking by repeatedly renting rooms to a sex trafficking venture, it nevertheless assists, furthers, and facilitates the sex trafficking activity by doing so.").

Choice characterizes R.B.'s allegations as mere failures to prevent trafficking, but that framing ignores the Complaint and the applicable law. R.B. alleges that Choice directly participated in the rental of rooms[20] and that it affirmatively controlled the policies and systems that shaped aspects

---

[18] *See, e.g.*, *Doe A.L.G.*, 2024 U.S. Dist. LEXIS 212384, at \*8; *R.K. v. Choice Hotels Int'l, Inc.*, 2025 LX 435228, at \*12 (E.D. Pa. Oct. 14, 2025); *C.T. v. Red Roof Inns, Inc.,* 2023 WL 3510879, at \*4 (M.D. Fla. Mar. 11, 2023) ("[T]o find the existence of a venture, the Court need consider only whether operating hotels is an enterprise involving risk and potential profit. Clearly, it is."); *Doe K.R. I,* 2024 U.S. Dist. LEXIS 104200, at \*13.

[19] *Cassone*, 2024 U.S. Dist. LEXIS 82778, at \*25; *L.M. III,* 2024 U.S. Dist. LEXIS 165863, at \*14; *M.A.*, 425 F. Supp. 3d at 964.

[20] Choice also argues that it played only a "marginal" or "tangential" role in room rentals because it did not personally rent rooms to R.B.'s trafficker. But that misreads ¶ 88 of the Complaint, which alleges that Choice owned

13

of operations related to whether trafficking was, or was not, detected or deterred at the College Park Comfort Inn, and that Choice used that control to operate the hotel in ways that facilitated trafficking. (*Id.* ¶¶ 87-88, 92). This is affirmatively providing services and a venue that facilitated trafficking, not a mere failure to act. Nor does the Complaint's reference to the hotel turning a blind eye toward trafficking change that. The allegation does not rely on turning a blind eye to trafficking in the world generally; it is expressly linked to the affirmative act of providing hotel rooms and related services and creating an environment that made it easier for traffickers to operate. (ECF No. 1 ¶¶ 98(a)-(e)). By doing this repeatedly over time, and in a way that signaled to traffickers that they could use the hotel without interference from staff, the hotel affirmatively facilitated trafficking on site. Moreover, the allegation about staff turning a blind eye is also clearly relevant to the constructive-knowledge standard, which charges a defendant with what it should have known through the exercise of ordinary diligence.

Choice also argues that it could not have participated in a venture with traffickers because, as a franchisor, it was too far removed from the trafficking activity. But there is no categorical rule exempting franchisors from liability for facilitating trafficking: whether a particular defendant's role in operations suffices to show "participation" in a **commercial venture** sufficient to support beneficiary liability under the TVPRA depends not on a label like "franchisor" but on the specific allegations about the defendant's role at the hotel. And Rule 12 forbids drawing inferences in Choice's favor merely because it is a franchisor.[21] And, while Choice implies that a venture must involve an in-person relationship, this is not supported by §1595(a)'s text, relevant case law, nor an understanding of how modern business relationships work. A business can facilitate trafficking

---

and operated the central reservation system, directly took reservations and payments, and dictated every step of the check-in process. That is neither marginal nor tangential.

[21] *A.D. I*, 2020 U.S. Dist. LEXIS 250759, at *11.

without in-person interaction, and doing so with the required *mens rea* is "participation in a venture."[22] This Court and others have found that a franchisor's role in renting rooms and operating a hotel suffices.[23]

### D. R.B. plausibly alleges mens rea.

A defendant's mental state may be alleged generally and supported with circumstantial evidence sufficient to make it plausible.[24] Under the appropriate standard, R.B. alleges that Choice had the requisite *mens rea*. Relevant allegations include:

- There was a known problem with sex trafficking in the hotel industry, and Choice was aware of this problem. (ECF No. 1 ¶¶ 30-50).

- Law enforcement agencies and other organizations developed "red flags" of sex trafficking in hotels, which served as indicators to the hotel industry on how to detect trafficking and were based on recurring patterns of how trafficking manifests in a hotel. The nature of the red flags is that they are things a hotel can detect in the ordinary course of operations. (*Id.* ¶¶ 38, 42, 48, 51-52). Choice was educated on these red flags and recognized them as indicators of sex trafficking. (*Id.* ¶ 43).

- There were also well-established practices known to the hotel industry for avoiding the facilitation of trafficking. (*Id.* ¶¶ 48-50, 92).

- Choice has long known about a significant problem with sex trafficking at Choice-branded hotels specifically. (*Id.* ¶ 58). News articles from before and during R.B.'s trafficking period documented a steady pattern of trafficking arrests and prosecutions at Choice-branded properties nationwide. (*Id.* ¶¶ 53-54). Online reviews of Choice-branded properties, which Choice monitored, documented the open presence of prostitution, commercial sex activity, and related criminal conduct at Choice locations nationwide. (*Id.* ¶¶ 55-57).

- Despite Choice's claim that it began supporting Polaris in 2010 and was partnering with ECPAT-USA in November 2010 to develop anti-trafficking training, Choice delayed for years before implementing anti-trafficking training at its hotels. (*Id.* ¶ 58).

- Choice adopted a brand-wide approach to trafficking-related issues at all Choice-branded properties. (*Id.* ¶ 52). Choice retained control over aspects of hotel operations related to the detection of and response to sex trafficking at the College Park Comfort Inn, including

---

[22] *Doe v. Mindgeek USA Inc.*, 558 F. Supp. 3d 828, 838 (C.D. Cal. 2021) (website participated in a venture with traffickers posting advertisements on website); *L.M. III*, 2024 U.S. Dist. LEXIS 165863, at *9 (*Doe #1*'s reasoning did not bar claim where plaintiff did not merely observe that franchisor "observed" trafficking at hotel but that franchisor's role in operations facilitated that trafficking).

[23] *See, e.g., Doe (A.R.J.)*, 2024 U.S. Dist. LEXIS 156829, at *8; *Doe C.M.S.*, 2025 LX 149587, at *23; *Doe (A.M.G.)*, 2025 LX 289536, at *13; *Doe (M.S.H.)*, 2025 LX 79118, at *13; *Doe T.W.*, 2025 LX 219100, at *12.

[24] *See G.G.,* 76 F.4th at 555; *S. Y. v. Wyndham Hotels & Resorts, Inc.*, 519 F. Supp. 3d 1069, 1082 (M.D. Fla. 2021); *E.B.*, 2023 U.S. Dist. LEXIS 231401, at *25.

training, policies, protocols, guest-identification requirements, payment policies, Wi-Fi provisioning and monitoring, and housekeeping oversight. (*Id.* ¶¶ 87-88, 92).

- Choice imposed detailed reporting requirements on Franchisee, maintained systems for guests to report security issues directly to Choice, and received reports of criminal activity occurring at the College Park Comfort Inn through those channels. (ECF No. 1 ¶¶ 74(f), (h); 87(a), (f); 108(n), (o)). Choice used numerous other tools to oversee and supervise the hotel. (*Id.* ¶ 74).

- Despite this knowledge and control, Choice continued operating in ways it knew or should have known would facilitate ongoing sex trafficking. (*Id.* ¶¶ 59-61, 89, 91-92).

- There were numerous signs associated with R.B.'s trafficking at the College Park Comfort Inn, which occurred on a recurring basis over an approximately two-year period beginning when R.B. was a minor. (*Id.* ¶¶ 26, 69). The signs of R.B.'s trafficking matched the industry-recognized red flags. (*Id.* ¶ 69).Hotel staff performing their ordinary job functions observed or were made aware of these obvious signs of R.B.'s trafficking. (*Id.* ¶¶ 27, 70).

- With reasonable diligence, Choice would have detected and deterred the trafficking at the College Park Comfort Inn. (*Id.* ¶¶ 77-79).

Collectively, these allegations support the inference that Choice at least should have known it was facilitating trafficking at the College Park Comfort Inn. This Court has denied 12(b)(6) motions filed by hotel franchisors based on materially similar allegations.[25]

Choice argues that this is insufficient because R.B. must plead that Choice had actual notice of her own trafficking specifically. That is wrong for two reasons. **First**, Congress chose a "should have known" standard, which is broader than actual notice and incorporates what a reasonably prudent person, or one with the defendant's superior knowledge, would have ascertained and acted upon.[26] Under this negligence-based standard, the inquiry includes whether Choice acted reasonably to detect trafficking in its operations.[27] **Second**, this Court rejected a victim-specific

---

[25] *See, e.g., Doe (K.E.C).*, 750 F. Supp. 3d at 736-738; *See Doe S.R.C.*, 2024 U.S. Dist. LEXIS 253404, at *30-33; *Doe T.D.B*, 2024 U.S. Dist. LEXIS 253400, at *29-32.

[26] Restatement (Second) of Torts, § 12 ("should have known" denotes "the fact that a person of reasonable prudence and intelligence or of the superior intelligence of the actor would ascertain the fact in question in the performance of his duty to another, or would govern his conduct upon the assumption that such fact exist").

[27] *Cf. Wood v. Sec. Credit Servs.*, LLC, 126 F.4th 1303, 1312 (7th Cir. 2025) (discussing application of "should have known" standard under federal statute). *K.A. v. 26th St. Hosp., LLP*, 2024 U.S. Dist. LEXIS 87132, at *15 (D.N.D. Apr. 15, 2024) (recognizing TVPRA creates a negligence-based standard); *Doe (K.E.C).*, 750 F. Supp. 3d at 736 (same).

16

framing in favor of a *venture-level* standard.[28] Choice's contrary position relies on a statement of the Eleventh Circuit in *Doe #1 v. Red Roof Inns, Inc.,* 21 F.4th 714, 724 (11th Cir. 2021), that a plaintiff must plead knowledge of a TVPRA violation "as to the plaintiff." 21 F.4th at 723. But the Eleventh Circuit itself has since disavowed that language as nonbinding dicta, explaining that *Red Roof* resolved the appeal on the participation element and did not reach the knowledge element. *A.G.*, 2026 WL 864178, at *24. In *A.G.*, the court held that § 1595(a) requires only knowledge "that the undertaking or enterprise violated the TVPRA, nothing more," and that requiring victim-specific knowledge would be both "atextual" and "illogical" because a defendant may plainly know of a TVPRA violation without knowing the identity of the victim. *Id.* at *25-26. To the extent *Red Roof*'s "as to the plaintiff" language ever supported Choice's reading, the Eleventh Circuit has now foreclosed that reading.

Rather than engage with the broad *mens rea* standard, Choice knocks down a strawman, arguing that general awareness of trafficking in the hotel industry is not enough. But R.B. does not rest on industry-level knowledge. She alleges that trafficking was pervasive in Choice's own operations, that Choice knew or should have known its practices facilitated that trafficking, and that it failed to exercise ordinary diligence in response to this known problem in its operations. She further alleges that the red flags associated with her own trafficking were so obvious that reasonable diligence would have detected them.[29] Constructive knowledge is a fact-bound inquiry that involves weighing the totality of the circumstances to determine what reasonable diligence required. In denying a 12(b)(6) motion in another TVPRA case, the Court recognized that the

---

[28] *Doe (T.D.B.) v. G6 Hospitality,* 9:23-cv-00174-MJT, ECF No. 55 at pp. 23–24 (E.D. Tex. Sept. 30, 2024) ("The mens rea language in § 1595(a) is tethered to the venture, not the victim[.]"); *see also G.G.*, 76 F.4th at 557; *Doe A.L.G.*, 2024 U.S. Dist. LEXIS 212384, at *9.

[29] *See, e.g., Doe (A.R.J.)*, 2024 U.S. Dist. LEXIS 156829, at *15-16 (recognizing this as proper basis for constructive knowledge).

17

"should have known" standard may be satisfied through knowledge of trafficking at multiple levels of generality, what it described as a Russian nesting doll structure.[30] Ultimately "should have known" is satisfied along a spectrum; evidence that may be insufficient standing alone can still be relevant as part of cumulative proof. *See Doe (E.M.B.) v. G6 Hosp., LLC*, 2025 U.S. Dist. LEXIS 173956 (E.D. Tex. Feb. 3, 2025). The question is whether the totality of what a defendant knew or could have discovered with reasonable diligence would have put it on notice that the venture was engaged in TVPRA violations.[31] Courts have held allegations like those here suffice.[32]

Choice generally objects that "red flags" are not sufficient to meet the constructive-knowledge element, and points to two specific red flags it asserts "would have been known only to Plaintiff and her trafficker": heavy foot traffic and the presence of unknown individuals. (ECF No. 11 at 9-10). That objection cannot be reconciled with the Complaint or with basic hotel operations. The Complaint alleges in detail that red flags are signs that can be detected by hotel staff in the ordinary course of their duties, and it identifies which categories of hotel staff are positioned to observe which categories of red flags, including front desk, security, housekeeping, maintenance, and room service. (ECF No. 1 ¶¶ 34-37). "Heavy foot traffic" in and out of a specific room, and "the presence of unknown individuals," are precisely the kinds of things a hotel can observe through ordinary operations and through reasonable diligence in monitoring the premises.

Choice's cherry-picking also ignores the totality of the allegations. R.B. pleads numerous red flags that hotel staff were plainly positioned to observe in the ordinary course of operations: she was a visibly underage girl present with an older unrelated man at check-in and during regular

---

[30] *Doe (T.D.B.)*, 9:23-cv-00174-MJT, ECF No. 55 at p. 22; *Jane Doe (K.E.C). v. G6 Hospitality*, 1:23-cv-00270, ECF No. 106, at 13 (E.D. Tex. Sept. 20, 2024).

[31] *M.A. II*, 2025 LX 464442, at *60-61 (denying summary judgment)

[32] *See, e.g., Doe (A.R.J.)*, 2024 U.S. Dist. LEXIS 156829, at *16; *Doe (T.W.) v. JRD P'ship,* 2025 LX 219100, at *20 (M.D. Tenn. Apr. 10, 2025).

school days; her trafficker paid for rooms in cash one day at a time; her trafficker frequently booked multiple rooms; she was visibly bruised from beatings; she appeared intoxicated despite her youth; housekeeping staff entering her room observed sex and drug paraphernalia; excessive towels were requested; loud altercations were audible from the rooms; "do not disturb" signs were constantly deployed, sometimes with one of her trafficker's associates stationed outside the door; and multiple other girls, including at least three minors, were being trafficked there simultaneously, collectively seeing up to fifty buyers per day. (ECF No. 1 ¶ 69). These are signs observable at check-in, during housekeeping rounds, from the lobby, in the parking lot, and during the other ordinary interactions that are core to the operation of a hotel.

Nor is there any merit to Choice's argument that the *mens rea* allegations are insufficient because hotels are not law enforcement agencies equipped to investigate or determine whether commercial sex involves force, fraud, or coercion. This District's precedent forcefully rejects this premise. In *Doe C.L.F. v. G6 Hosp., LLC*, 2025 U.S. Dist. LEXIS 232047 (E.D. Tex. Nov. 17, 2025), Magistrate Judge Stetson excluded a defense expert who would have testified that hotel staff cannot reliably assess potential trafficking red flags because they lack the investigative tools, legal authorities, and interagency resources available to law enforcement. Choice making what is essentially the same argument at the 12(b)(6) stage does not justify discrediting R.B.'s allegations. Moreover, Choice's argument misunderstands what constructive knowledge requires as a matter of basic tort law. Under the Restatement, a person has constructive knowledge of a fact when they know of other facts sufficient to put a reasonable person on inquiry, and reasonable inquiry would have revealed the fact. *See* Restatement (Second) of Torts § 12 cmt. a. The standard does not require a defendant to conduct a complete investigation, rule out all innocent explanations, and arrive at a definitive conclusion before knowledge is charged. It requires only that observable

19

circumstances were sufficient to trigger a duty of reasonable inquiry, and then imposes one of two obligations: either conduct that inquiry, or act on the reasonable presumption that the suspicious circumstances reflect the harm they appear to reflect and refrain from facilitating the activity in the meantime. A defendant who is presented with circumstances sufficient to put a reasonable person on notice of trafficking, and who neither investigates further nor stops facilitating the conduct, cannot hide behind the absence of confirmed knowledge.

Choice argues that it cannot have the required *mens rea* because it was a franchisor not physically present at the hotel. But courts, including this one, have repeatedly found the *mens rea* element satisfied as to a franchisor based on the degree of oversight and control the franchisor exercised over the hotel.[33] R.B. alleges that Choice imposed detailed reporting requirements on Franchisee and that Franchisee reported criminal activity occurring at the College Park Comfort Inn up to Choice. (ECF No. 1 ¶¶ 74(f), (h)). Choice also assumed joint responsibility with Franchisee for detecting and preventing human trafficking at the hotel and established systems for guests to report security issues directly to Choice. (*Id.* ¶ 87(a), (f)). And Choice collected and monitored reports through the backend of the Choice ADVANTAGE property management system and used those reports to supervise the hotel's day-to-day operations. (*Id.* ¶ 108(o)). Choice also supervised the hotel through numerous other means: monitoring online reviews, monitoring news reports of criminal activity at Choice hotels, conducting regular and unannounced inspections, deploying field-based associates to visit the hotel, soliciting and analyzing guest surveys and complaints, and capturing extensive guest and operational data. (*Id.* ¶ 74). And Choice retained and exercised brand-level control over the specific areas of hotel operations most directly relevant to identifying and responding to trafficking: training content, anti-trafficking protocols,

---

[33] *See, e.g., Doe K.E.C.*, 750 F. Supp. 3d at 736-737; *K.R.* I, 2024 U.S. Dist. LEXIS 104200, at *31; *A.B*, 2025 LX 290252, at *7; *Doe (M.S.H).*, 2025 LX 79118, at *18-19; *Doe C.M.S.*, 2025 LX 149587, at *41-42.

and the policies governing payment, identification, and guest access that created the environment traffickers exploited. (*Id.* ¶¶ 87-88, 92). Because failure to exercise reasonable diligence provides a basis for charging constructive knowledge, the allegations of Choice's control over these areas are directly relevant to the constructive-knowledge analysis. A franchisor that exercises this degree of oversight and control, yet still fails to detect or respond to years of open, obvious trafficking presenting with readily detectable red flags, at minimum is properly charged with constructive knowledge. And R.B.'s trafficking presented with the type of readily detectable red flags that a diligent hotel, with properly trained staff and reasonable procedures in place, would have detected. Taken together, those allegations readily support, at minimum, constructive knowledge.[34]

R.B. also satisfies the *mens rea* element based on knowledge imputed from Choice's agents: Franchisee and the hotel staff who directly observed the "red flags" at the hotel. While the agency relationship alleged supports the vicarious liability claim discussed below, it also separately supports imputing knowledge to Choice for a direct beneficiary claim.[35]

## II.    R.B. Pleads a Vicarious Liability Claim Against Choice.

R.B. also pleads a vicarious liability claim against Choice based on Franchisee's TVPRA violations. Choice's vicarious liability arguments conspicuously fail to address this Court's decision in *K.E.C.*, which denied a motion to dismiss against a hotel franchisor on allegations similar to those here. 750 F. Supp. 3d at 738-39. Choice raises three arguments against R.B.'s vicarious liability claim under the TVPRA. Each fails.

---

[34] *See, e.g.*, *A.B*, 2025 LX 290252, at *7 (allegations that franchisor inspected and audited the hotel plus obvious signs of trafficking sufficient under "should have known" standard); *Doe C.J.*, 2024 U.S. Dist. LEXIS 188925, at *8-9 (allegations that franchisor maintained operational oversight enough to support inference of "should have known" based on obvious signs of trafficking at hotel); *Doe (M.S.H).*, 2025 LX 79118, at *18-19 ("should have known" supported by ways defendant monitored hotel).
[35] *See Doe (A.M.G).,* 2025 LX 289536, at *16-*17; *L.M. III,* 2024 U.S. Dist. LEXIS 165863, at *17.

**First**, Choice argues that the TVPRA does not allow for vicarious liability. But the TVPRA is a federal-tort statute, and "when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules." *Meyer v. Holley*, 537 U.S. 280, 285 (2003). It is well-established that ordinary agency principles apply to TVPRA claims.

**Second**, Choice argues that R.B. has not plausibly alleged an agency relationship with Franchisee. But this Court concluded that allegations materially like those here were sufficient to plead an agency relationship in a TVPRA case. *See Doe (K.E.C.)*, 750 F. Supp. 3d at 739. Courts across the country analyzing TVPRA claims routinely agree.[36]

Specifically, R.B. alleges that Choice exercised systematic and pervasive control over Franchisee through extensive standards, rules, and manuals governing the means and methods used to operate the College Park Comfort Inn, and through direct involvement in hotel operations. (ECF No. 1 ¶¶ 87-88, 105-108). Nor is there any merit to Choice's argument that R.B.'s allegations are conclusory: the Complaint lists dozens of specific ways that Choice exercised control over the operation of the College Park Comfort Inn. (*Id.* ¶¶ 87-88, 107-108). This includes ways that Choice exercised control over the specific aspects of operations related to trafficking, including training of hotel staff on detecting and responding to trafficking, adoption and enforcement of policies and protocols regarding trafficking, employment of field-based associates who work with hotels on trafficking issues, auditing of hotels to evaluate safety and security measures, guest reservation and check-in processes, and guest-identification and payment policies. (*Id.* ¶¶ 87(a)-(f), 88, 109).

---

[36] *A.B*, 2025 LX 290252, at *12; *Doe (K.R.D).*, 2025 LX 149015, at *11-12; *Doe T.W.*, 2025 LX 219100, at *21-23; *Doe (A.M.G).,* 2025 LX 289536, at *18; *S.Y. v. Naples Hotel Co.,* 476 F. Supp. 3d 1251, 1258 (M.D. Fla. 2020); *K.B. v. Inter-Cont'l Hotels Corp.*, 2020 WL 8674188, at *7 (D.N.H. Sept. 28, 2020); *A.D. v. Wyndham Hotels & Resorts, Inc.,* 2020 U.S. Dist. LEXIS 250670, at *13 (E.D. Va. Sep. 21, 2020) (*A.D. II*).

Choice's attempt to reframe these allegations of control as mere "brand standards" required by the Lanham Act and irrelevant to vicarious liability is unavailing. Evaluating similar allegations of a franchisor's control over aspects of its franchisee's operations that contributed to the plaintiff's harm, this Court already rejected this argument. *Doe K.E.C.*, 750 F. Supp. 3d at 739. Without addressing this precedent, Choice advances an argument that would improperly insulate franchisors from liability regardless of the extent of operational control they exercise. And the Complaint specifically alleges that the requirements Choice imposed on Franchisee "significantly exceeded what was necessary for Choice to protect [its] trademarks," covered virtually all aspects of hotel operations, and dictated the specific means and methods Franchisee used rather than simply setting quality or outcome standards. (ECF No. 1 ¶ 107). Moreover, Choice's contrary argument improperly asks the Court to draw inferences in its favor by accepting its characterization of the relationship rather than what R.B. pleads.

**Finally**, Choice asserts in conclusory fashion that R.B.'s vicarious liability claim fails because R.B. has not pleaded an underlying claim against Franchisee. Choice offers no independent analysis to support this assertion. Instead, Choice relies on the same arguments it advances to challenge the sufficiency of the direct liability claims against itself. But those arguments fail for the reasons addressed above. Moreover, many of Choice's arguments depend on its status as a franchisor and do not even arguably apply to Franchisee, the on-site owner and operator.

### III.    Section 2255 Authorizes the Claims that R.B. Brings against Choice.

Section 2255 creates a civil cause of action for victims of certain federal crimes, including trafficking of a minor under 18 U.S.C. § 1591. 18 U.S.C. § 2255. While Choice does not dispute, for the purpose of Fed. R. Civ. P. 12(b)(6), that R.B. pleads that she was a victim under § 1591, it nevertheless contends that R.B. fails to state a claim under § 2255 because she does not allege that Choice directly committed a trafficking offense. On Choice's view, § 2255 authorizes civil actions

23

only against criminal perpetrators. Not so. Section 2255 is a civil-remedy statute; it specifies who may sue, what predicate offenses trigger the remedy, and what relief is available. It does not restrict civil liability to the direct criminal perpetrator of the underlying offense. Nor does it disturb agency principles routinely read into federal tort statutes. Courts closely examining § 2255 have thus rejected the cramped construction Choice advocates here.[37]

### A.  Section 2255 applies to claims against beneficiaries of trafficking.

The Court should reject Choice's argument that § 2255 only applies to claims against perpetrators. Choice is right about the method: ordinary tools of statutory interpretation control. But it is wrong about what the statute says, which in relevant part is:

> Any person who, while a minor, was a victim of a violation of section . . . 1591 . . . of this title and who suffers personal injury as a result of such violation . . . may sue in any appropriate United States District Court.

18 U.S.C. § 2255. This language expressly authorizes a civil cause of action for individuals trafficked as minors. Contrary to Choice's argument, nothing in § 2255's text limits civil liability to criminal perpetrators, requires a conviction, or demands that the civil defendant personally committed each trafficking act. The statute authorizes suit by a "victim of a violation"; it does **not** say the suit must be "against the violator." Defendants' reading would require inserting limiting words Congress did not include: "may sue *the perpetrator*" or similar language. "Had Congress intended to limit liability in this respect, it could have done so by including such qualifying language in the statute." *Jane Doe No. 8*, 860 F. Supp. 2d at 1340. When Congress intends to confine a civil cause of action to perpetrators of a crime, it knows how to do so. *Id.* "Nothing in § 2255 limits claims under the statute to only perpetrators." *Bates I*, 2025 WL 2917756, at *5 (holding plaintiff could bring a beneficiary claim under Section 2255).

---

[37] *See, e.g.*, *K.F. v. Choice Hotels Int'l, Inc.*, 2024 WL 1256052, at *3 (S.D. Ohio Mar. 25, 2024); *Jane Doe No. 8 v. Royal Caribbean Cruises, Ltd.*, 860 F. Supp. 2d 1337, 1340 (S.D. Fla. 2012); *Bates v. Seuqel Youth & Family Services*, LLC, 2025 WL 2917756, at *5 (N.D. Ala. Oct. 14, 2025) (*Bates I*).

Nor does § 2255 specifically define the conduct it prohibits or limit its scope to conduct that violates the criminal law. The text and structure make clear that the reference to criminal provisions serves to identify the class of eligible plaintiffs, not to limit the conduct that can give rise to liability under the statute. It extends to civil actions seeking recovery of damages "as a result of" trafficking. That causation-based standard readily encompasses claims against defendants whose liability arises under established civil-liability theories, including beneficiary liability.[38] Thus, properly understood, § 2255 establishes two requirements for a claim: (1) the plaintiff was a minor when she was a victim of a violation of § 1591, and (2) the plaintiff seeks to recover for "personal injury as a result" of that trafficking. R.B.'s claims here satisfy both requirements.

R.B.'s allegations support a conclusion that Choice is liable for "personal injury as a result" of her trafficking as a minor. Specifically, she alleges that Choice is liable as a beneficiary under the same standard Congress recognized and authorized in § 1595(a) of the TVPRA, creating a cause of action for victims of certain trafficking crimes, including those defined in § 1591(a), to allow them to recover damages resulting from their trafficking. While Choice raises the concern that anything other than perpetrator liability will sever the causal connection between sex trafficking and recoverable damages, Congress expressly recognized in § 1595(a) a framework reflecting its judgment that a knowing beneficiary's conduct is sufficiently connected to a victim's injuries to warrant civil accountability. Section 2255's "as a result of" language incorporates that same causal concept; it does not silently exclude it. While § 1595(a) already authorizes a cause of action for victims of § 1591, § 2255 serves a distinct function: it extends additional procedural protections to a limited subset of those victims, those trafficked as minors, including nationwide jurisdiction

---

[38] *A.M. v. Wyndham Hotels & Resorts, Inc.*, 728 F. Supp. 3d 787, 795 (S.D. Ohio 2024).

and the elimination of the statute of limitations. Choice's restrictive interpretation undermines § 2255's remedial purpose.

Choice's attempt to narrow the scope of § 2255 by reading in the requirement that the civil defendant be a criminal perpetrator conflicts with applicable principles of statutory interpretation. It is well-established that remedial statutes must be construed liberally to effectuate their purpose, and this principle applies to Section 2255, which is a remedial statute:

> Although the predicate criminal offenses may be designed to punish the criminal offender, § 2255 is designed for a different purpose—namely, to compensate the victim. And because the predicate criminal offenses and § 2255 are designed for different purposes, it does not follow that there must be symmetry in liability. In fact, the broad remedial purpose of § 2255—prescribing a minimum amount of statutory damages—would appear to counsel against limiting the scope of civil liability.

*Jane Doe No. 8*, 860 F. Supp. 2d at 1340.

Relatedly, Choice leans on the list of criminal predicates enumerated in § 2255 to argue that the statute "exclusively references criminal statutes" and therefore cannot reach beneficiary defendants. The argument fails on its own terms. Section 1595(a) could not reasonably be expected to appear in § 2255(a)'s list. The enumerated predicates in § 2255 identify the underlying criminal victimization that gives rise to the claim. R.B.'s claim falls squarely within that list because she alleges that she was a minor victim of § 1591. *See* 18 U.S.C. § 2255(a). The absence of § 1595 from the list is unremarkable because § 1595 does not define a type of victimization; it creates a civil cause of action. No one is a "victim of a violation of § 1595" in the way that a person is a victim of a violation of § 1591; a beneficiary claim under § 1595(a) is necessarily derivative of an underlying criminal TVPRA violation. Properly understood, then, § 2255's enumerated list establishes only that a plaintiff must have been a minor victim of one of the listed criminal offenses. It says nothing about which defendants may be held civilly liable for the resulting harm. The courts

26

that have adopted Choice's perpetrator-only reading have done so by "actually add[ing] language to the statute" that Congress did not write. *Bates v. Sequel Youth & Family Services, LLC*, 2026 WL 86833, at *4 (N.D. Ala. Jan. 12, 2026) (*Bates II*).

A recent decision rejected the argument Defendants make here, finding that it did not even present "substantial ground for difference of opinion" warranting interlocutory appellate review. In *Bates II*, 2026 WL 86833, a defendant who was alleged only as a § 1595(a) beneficiary, not a direct criminal perpetrator, sought certification of interlocutory appeal on the precise question Defendants raise here: whether § 2255 applies to non-perpetrator defendants. The court denied certification, concluding that there was no substantial ground for difference of opinion on the issue. *Id.* at *4–5. The court grounded its analysis in the plain text of § 2255(a), which "simply does not contain the limiting words 'against the perpetrator'" that would be necessary to restrict the statute to criminal actors. *Id.* at *5. In doing so, the court expressly criticized cases adopting the contrary position for "actually add[ing] language to the statute" that Congress did not write. *Id.* at *4. That criticism lands squarely on Defendants' argument here, which depends on reading a perpetrator-only limitation into statutory text that contains no such restriction.

Moreover, Choice's reliance on *Central Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164 (1994), is misplaced. In *Cent. Bank*, the Supreme Court was interpreting § 10(b) of the Securities Exchange Act of 1934, which authorizes criminal penalties for one who commits a manipulative or deceptive act in connection with the purchase or sale of securities and which has also been interpreted to include an **implied** private right of action. *Id.* The Court in *Cent. Bank* declined to read an **additional implied cause of action** for aiding-and-abetting liability into this provision. *Id.* at 171. But *Cent. Bank* is distinguishable for several reasons.

27

**First**, *Cent. Bank* was *not* about defining the scope of a civil cause of action that Congress expressly created; instead, it was about whether to create an *implied* cause of action.[39] **Second,** *Cent. Bank* emphasized that the relevant language in § 10(b) expressly defined the **prohibited conduct** in a way that did not include aiding and abetting. 511 U.S. at 173. By contrast, § 2255 expressly creates a cause of action and defines the eligible plaintiffs and compensable injury but does *not* define the prohibited conduct, instead setting out a causation-based standard consistent with background principles of civil liability.[40] **Third**, the *Cent. Bank* Court emphasized that Congress had not authorized aider-and-abettor liability in any provision of the federal securities law. 511 U.S. at 179. Here, by contrast, Congress expressly authorized a cause of action for beneficiary liability for victims of sex trafficking under § 1591. *See* 18 U.S.C. § 1595(a).

**Finally**, unlike the statute in *Cent. Bank*, Section 2255 is a tort statute that implicates background tort principles. Choice's effort to characterize § 2255 as a criminal statute is misguided. Section 2255 is a civil remedial provision. Its title—"Civil remedy for personal injuries"—and its authorization of recovery for "actual damages" resulting from "personal injury" confirm that Congress created a tort remedy, not a criminal enforcement mechanism. The term "personal injury" has long been recognized as referring to torts or tort-like injuries, including both physical torts and dignitary torts such as defamation.[41] The reference to criminal violations serves only to identify the type of harm suffered, not to limit who may be held civilly responsible.

---

[39] *Boim v. Quranic Literacy Inst. & Holy Land Found. For Relief And Dev.*, 291 F.3d 1000, 1019 (7th Cir. 2002) (distinguishing Cent. Bank on this basis).

[40] *Cf. Boim*, 291 F.3d at 1020 (distinguishing *Cent. Bank* where Congress created a civil cause of action based on causation standard).

[41] *See United States v. Burke*, 504 U.S. 229, 234 & n.6, (1992) (interpreting the phrase "personal injuries" in 26 U.S.C. § 104(a)(2) as incorporating common-law **tort** concepts and including nonphysical injuries); *see also Injury, Black's Law Dictionary* (11th ed. 2019) (defining "personal injury" as "[a]ny invasion of a personal right, including mental suffering ....").

28

And, for these same reasons, the other case law that Choice cites adopting a narrow interpretation of § 2255, is unpersuasive because those decisions rely heavily on *Central Bank* while ignoring these key distinctions. *Bates* expressly criticized this line of reasoning for "actually add[ing] language to the statute" that Congress did not write. 2026 WL 86833, at *4.

### B.  Section 2255 does not displace ordinary agency principles.

R.B. also pleads that Choice is vicariously liable for Franchisee's violations under § 2255. Choice responds that § 2255 categorically forecloses vicarious liability. It does not. Choice's contrary argument depends on a faulty premise: that statutory silence about vicarious liability is the same thing as a prohibition. The Supreme Court has rejected that premise. When Congress creates a civil cause of action, courts presume Congress legislated against the backdrop of ordinary agency principles unless Congress clearly indicates otherwise. *Meyer v. Holley*, 537 U.S. 280, 285 (2003). So, the question is not whether § 2255 expressly authorizes vicarious liability; the question is whether § 2255 clearly displaces the default rule that it does. Nothing in the statute does. Congress's repeated silence as to persons liable is much more conspicuous than its silence as to vicarious liability, and indeed supports the availability of vicarious liability.[42] *Central Bank* does not change the analysis. Courts have long recognized that *Central Bank*'s rejection of implied aiding-and-abetting liability has no bearing on incorporation of common-law agency principles.[43]

### IV.    Venue is Proper.

Choice argues that venue is not proper in the Eastern District of Texas. The argument is largely contingent on Choice's prior contention that R.B. has not pleaded a valid claim under § 2255. For

---

[42] *A.M. v. Wyndham Hotels & Resorts, Inc.*, 728 F. Supp. 3d 787, 795, n.3 (S.D. Ohio 2024) ("Congress's repeated silence as to persons liable is much more conspicuous than its silence as to vicarious liability, and indeed supports the availability of vicarious liability.")

[43] *See, e.g., AT&T Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1430-31 (3d Cir. 1994); *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 708 (7th Cir. 2008). For one thing, agency liability is not a separate cause of action; it is vicarious, not secondary liability. *AT&T Co.,* 42 F.3d at 1430-31. Moreover, aiding-and-abetting liability lacks the deep common-law pedigree that agency principles possess, and Congress has taken a statute-by-statute approach to authorizing it. *Id.* Not so for agency principles, which *Meyer* teaches apply to federal tort statutes as a default rule

29

the reasons explained above, that contention fails, and R.B. properly invokes § 2255's nationwide

jurisdiction, which in turn makes the Eastern District of Texas a proper venue under § 1391(b)(1).

Beyond that contingent argument, Choice asserts in conclusory fashion that there is "no need" to

resort to § 2255 because the ordinary venue rules permit suit in a district where a substantial part

of the events occurred. *See* 28 U.S.C. § 1391(b)(2). That observation is irrelevant. Venue may be

proper in more than one district, and a plaintiff is entitled to choose among available proper venues.

*See* 28 U.S.C. § 1391(b) (authorizing suit in a district that satisfies any one of the enumerated

provisions). Choice does not argue that venue is improper if R.B. has pleaded a valid claim under

§ 2255, which she has. That is the end of the inquiry.

## CONCLUSION

For these reasons, the Court should deny Choice's motion in its entirety.

Respectfully submitted,

**PROVOST ✶ UMPHREY LAW FIRM, L.L.P.**

*/s/Bryan O. Blevins, Jr.*
BRYAN O. BLEVINS, JR.
Texas Bar No. 02487300
MATTHEW MATHENY
Texas Bar No. 24039040
COLIN D. MOORE
Texas Bar No. 24041513
CLAIRE BROWN
Texas Bar No. 24108010
350 Pine Street, Ste. 1100
Beaumont, TX 77701
(409) 835-6000 Telephone
bblevins@pulf.com
mmatheny@pulf.com
cmoore@pulf.com
cbrown@pulf.com

**ATTORNEYS FOR PLAINTIFF**

30

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of April 2026, a true and correct copy of the foregoing document was served upon all counsel of record via CM/ECF.

/s/*Bryan O. Blevins, Jr.*
Bryan O. Blevins, Jr.

31